Motion to dismiss appeal denied September 20, 1932; argued
March 14; affirmed March 28; rehearing denied
June 13, 1933

## KEADLE *v.* PADDEN ET AL.

(20 P. (2d) 403, 22 P. (2d) 892)

*Frank S. Senn,* of Portland (Senn & Recken, of Portland, on the brief), for appellant.

*A. P. Kelley,* of Portland (Teal, Winfree, McCulloch & Shuler, of Portland, on the brief), for respondent.

CAMPBELL, J. This is an action for damages claimed to have resulted from the negligence of defendants in taking an impression of the auricle and auditory canal of plaintiff's right ear.

Plaintiff alleges, in effect, that on March 21, 1930, he was an able-bodied man, with normal sight, hearing and muscular control; and that he was employed and for many years prior thereto, as an able-bodied and skilled aviator; that on that date, defendant, E. H. Padden, was a duly qualified and licensed physician and surgeon, who undertook to make an impression of the auricle and auditory canal of plaintiff's right ear; that in performing the operation, Dr. Padden was negligent and careless and failed to exercise due care in the method and manner adopted, to wit: "In that said E. H. Padden failed to properly pack said canal and poured said plaster of Paris to an excessive depth in the ear canal, allowing said plaster to harden to a consistency of good hard butter and then attempted to remove said plaster"; that in removing the cast, a portion of it was broken off and remained tightly wedged

in the auditory canal; that, thereafter, Dr. Padden found it necessary to take plaintiff to Dr. Belknap, who was also a duly qualified and licensed physician and surgeon, specializing on the eye, ear, nose and throat and who performed a surgical operation in order to remove the part of plaster of Paris left in plaintiff's ear.

The result of the work on plaintiff's ear was the permanent loss of his hearing and the permanent impairment of the sight of his right eye and his sense of balance. The removal of the obstruction from plaintiff's ear necessitated a further surgical operation which, although properly performed, injured the nerves of the right side of plaintiff's face, causing a partial permanent paralysis and disfigurement, for all of which he prayed damages in the sum of $100,000.

To this complaint, defendants entered a general denial except that they admitted they were duly licensed and qualified physicians and surgeons.

For a separate defense, they alleged that Dr. Padden attempted to make an impression of the interior part of plaintiff's ear in a proper manner, by the use of a proper plaster of Paris mixture and that while removing the cast impression plaintiff moved his head and thereby broke the cast, leaving a part of it in the auditory canal; that plaintiff left the office of Dr. Padden and returned several hours later under the influence of liquor, contrary to the doctor's instructions; that thereafter Dr. Belknap removed the plaster from plaintiff's ear and whatever injury plaintiff suffered was through his own negligence.

For a second defense, they plead settlement and release.

The new matter in the answer was put at issue by the reply.

The cause was tried to a jury. At the close of plaintiff's evidence in chief, defendant moved for a nonsuit which was allowed as to defendant Dr. Belknap and denied as to defendant Dr. Padden.

When all the testimony was submitted, defendant Dr. Padden moved for a directed verdict which was denied. The cause was submitted to the jury which returned a verdict for plaintiff in the sum of $15,000, upon which judgment was entered. Defendant Dr. Padden appeals.

Plaintiff's testimony tended to show that plaintiff, at the time he entered Dr. Padden's office on March 21, 1930, the day of the injury, was an able-bodied man, with normal sight, hearing and muscular control. He was in the employ of the Pacific Air Transport Company as an aviator. At the same time, Dr. Padden was a physician and surgeon in the employ of the same company and whose duty it was to make a monthly medical physical examination of the company's aviators; that on said date, plaintiff was called in to Dr. Padden's office and informed that it was necessary to have an impression made of the auricle and auditory canal of his ears for the purpose of making phonettes that would fit his ears, for his use while flying an airplane. To this plaintiff submitted. It appears that this impression is made by first thoroughly cleansing and lubricating the canal and auricle, then properly packing the interior or osseous part of the auditory canal with cotton from the eardrum to, what is referred to by physicians as, the false isthmus or the bend in the canal, and then pouring into the ear a plaster of Paris preparation of the consistency of "about the ordinary whipping cream" and permitting it to harden for eight minutes to the consistency of "good hard

butter," and then extracting the cast. Dr. Padden testified that he first properly cleansed and lubricated the ear, then packed it with cotton from the eardrum outwardly about a quarter of an inch before pouring the cast; that he then had plaintiff lie down on his left side with his head resting on its left side, and then poured this plaster of Paris mixture into the canal, filling the canal and auricle flush with the external surface of the ear; that he poured it down into the osseous part of the canal; "I poured it down to on top of the plug of cotton". When asked the direct question on cross-examination,

"Q. Now, Doctor, counsel asked you something about pouring this, I will ask you to state whether or not you poured this into the ear of Mr. Keadle, whether you poured it past the false isthmus?

"A. No, it was plugged with cotton up to that part".

He further testified that while he was removing the cast impression plaintiff moved his head, causing the cast to break. The doctor then attempted to remove the part remaining in the ear with a pair of pointed forceps, such as would be ordinarily used for that purpose. He was unable to get a sufficient hold on the fragment and the forceps would slip off. He made eight or ten attempts, but failed. These attempts made the plaintiff extremely nervous so he requested the doctor to permit him to go over town to get a drink of moonshine to steady his nerves. To this the doctor agreed, but advised him not to be absent more than fifteen minutes. Plaintiff left the doctor's office at the Swan Island airport, drove his car up the east side to one of the bridges where he crossed over to the west side of Portland and obtained two drinks of moon-

shine. The location of the station where he was served
is not disclosed by the testimony. The doctor further
testified that plaintiff returned to the airport under
the influence of liquor, nearly two hours after he had
left. No further attempt to remove the fragment was
made that evening. The doctor advised plaintiff to
meet him at Dr. Slocum's office in Portland at 9 o'clock
the next morning. When they met the next morning
at Dr. Slocum's office, Dr. Padden and a nurse at-
tempted to put plaintiff to sleep with gas, but were
unsuccessful. The doctor thereupon took plaintiff to
the office of Dr. Belknap who gave plaintiff a general
anesthetic and removed the fragment. The evidence
does not show that the moonshine or delay had any
particular effect on the condition of plaintiff's ear or
the fragment therein. In any event, it would be a ques-
tion for the jury to determine under proper instruc-
tions.

The real question in the case is, was the plaster
of Paris mixture poured down past the false isthmus
into the osseous part of the auditory canal?

All the experts agree that it would be proper
practice to make an impression of the auditory canal
with the material and in the method which Dr. Padden
used, if the canal was plugged up with a material like
cotton as far as the false isthmus and that the plaster
of Paris mixture should not be permitted to extend be-
yond or go deeper into the canal than the false isthmus.
Those experts, who were asked the question, all testi-
fied that it would be improper to attempt to take an
impression if the plaster of Paris mixture should be
poured past the false isthmus or the bend in the audi-
tory canal. There was evidence tending to show that
the mixture was poured to too great a depth.

In order to understand this question, it is necessary to give a description of what anatomists refer to as the external auditory canal:

"The external auditory canal is a tubular passage, about an inch (2.5cm.) in length, which leads from the concha to the tympanic membrane. It forms an S-shaped curve and is directed inward, forward, and upward, then inward and backward. * * * The external portion of this canal consists of cartilage, which is continuous with that of the auricle; the internal portion is hollowed out of the temporal bone. It is lined by a prolongation of the skin, which in the outer half of the canal is very thick and not at all sensitive, and in the inner half is thin and highly sensitive". Textbook of Anatomy and Physiology, Kimber and Gray, 8th Ed., 527.

■ ■ The first assignment of error is based on the court's refusal to allow defendant to show that plaintiff was discharged by his employer, the Varney Air Lines, as an aviator, because of intoxication.

It appears that sometime after the alleged injury plaintiff obtained employment as an aviator with the Varney Air Lines and was later discharged from such employment. It was admitted by plaintiff, that such discharge was not brought about by, or in any way influenced by reason of any disability produced by the injuries complained of. After such admission, we cannot see wherein the cause of his discharge is material to any of the issues presented herein.

■ ■ ■ These assignments of error are based on the court permitting Dr. Kistner and Dr. Ainslie, expert witnesses called by plaintiff, to answer a certain hypothetical question.

The witnesses testified as expert medical men specializing in medicine and surgery of the eye, ear, nose and throat and practising the profession in Port-

land. Their qualifications as such experts were admitted by defendant. Each of these witnesses was asked if he was familiar with the practice of physicians in taking such impressions (as was made of plaintiff's ear) in Portland and vicinity and he answered he was not. He further testified that there was no such practice in Portland and vicinity. This would not disqualify him as an expert on the matter involved and in issue in this case. Nor would the fact that the witness said, "I am not at all familiar, or at all conversant with the practice of the profession in this sort of work," be grounds for striking out his answer. Dr. Ainslie said that he would not attempt to make a cast in that manner. The record does not disclose that any one except defendant ever practised the art of taking impressions of the auricle and auditory canal of the ear with plaster of Paris preparation in the manner in which defendant practised on plaintiff.

This is not an ordinary case of a surgical operation where a qualified surgeon performs an operation in an attempt to cure or remove a cause of disease. It is unnecessary to cite authorities that, in such a case, the surgeon is not held to guarantee results; if he possesses the ordinary measure of skill required of a surgeon in the community and locality where he practises, he is not liable for any damage arising from an error in judgment if he has used such care and skill. In such a case, a surgeon can only make a limited examination of the part to be operated on. In the instant case, there is no reason why the surgeon should not fully discover all about the mechanical structure of the part of plaintiff's ear of which he was about to take an impression. All the experts agree that no two ears are exact duplicates. The length of the canal varies. The outer or cartilaginous portion may be long and

the osseous part short or vice versa. The angle formed at the point where the outer part joins the inner part varies in different ears. It does not require an expert to know that if a substance like plaster of Paris is poured into a tubular canal that is not straight, somewhat constricted midway, and the walls of which are immovable beyond the constriction, and permitted to set until it reaches the consistency of "good hard butter," it cannot be extracted without breaking. It was not error for the court to permit the witness to answer the question.

██ ██ This assignment is based on the court's allowance of an amendment to the complaint at the close of plaintiff's testimony.

The appellant contends that the complaint, before the amendment was made, did not state a cause of action. That the statute of limitations had run before the amendment was made; that, by allowing the amendment, the court permitted plaintiff to evade the statute by stating a cause of action after the bar of the statute. Before the amendment objected to was offered, the charging part of plaintiff's complaint read, in paragraph III of the complaint,

"That on or about said 21st day of March, 1930, and subsequently the defendant, E. H. Padden, undertook to make and take an impression of the plaintiff's right ear and a portion of the right auditory canal leading into the plaintiff's head; that the defendant, E. H. Padden, in performing said undertaking of making and taking an impression of said ear and right auditory canal, caused an obstruction of and placed an obstruction in the plaintiff's said right ear and right auditory canal of a hard stone-like substance, which substance and obstruction the plaintiff was informed by the defendant's, and each of them, could not be removed without a surgical operation.",

and in paragraph V,

"That the defendants and each of them failed and neglected to use due and proper skill and were so negligent toward the plaintiff in the performance of the acts of each, as herein alleged, * * *".

The above allegations were sufficient to state a cause of action for negligence in the absence of any motion or demurrer. *Weinstein v. Wheeler*, 135 Or. 518 (295 P. 196, 296 P. 1079); *Sylvis v. Hayes*, 138 Or. 418 (6 P. (2d) 1098); *Cederson v. Oregon, Etc.*, 38 Or. 343 (62 P. 637, 63 P. 763). The amendment was timely offered. Oregon Code 1930, § 1-906.

■ This assignment of error is based upon the court's refusal to grant a nonsuit.

■ This assignment of error is based upon the court's refusal to direct a verdict for defendant.

We need not concern ourselves with assignment of error No. 6, as the same question is presented in No. 9.

■ Defendant contends that before the cause should be submitted to the jury plaintiff must produce medical testimony showing that defendant was guilty of negligence. To support this contention, he relies on the answer to the hypothetical question submitted to Dr. Kistner, an expert called by plaintiff and whose qualifications are and were admitted by defendant. The question asked by plaintiff of the expert reads as follows:

"* * * Assume, Dr. Kistner, that a physician undertakes to make an impression of the concave surface of the right auricle, and the portion of the right auditory canal leading into the head of a man for the purpose of making a cast from which a phonette could be made like Plaintiff's Exhibit 1 (tendering object to witness) and in so doing the physician after thoroughly and properly cleansing the auditory canal and auricle, puts a plug of cotton large enough to completely plug

the ear back fairly close to the eardrum, then thoroughly and properly lubricates the auditory canal and auricle, then causes the man to lie with his left ear down and right ear up and then slowly pours the plaster of paris mixed with water to the consistency of ordinary whipping cream into the canal, filling said canal with the plaster of paris to within one quarter of an inch of the ear drum and filling the concave portion of the right auricle with said plaster and then allowed this plaster of paris to harden so that it becomes a little bit harder than good hard butter and is still wet and then attempts to remove said cast, in your opinion would said procedure be proper or not?''

The doctor answered, ''No''.

On cross-examination, counsel for defendant changed the question by inserting into it, the words, *''but not past the false isthmus.''*, in reference to the manner of pouring the plaster of Paris.

The evidence shows, in conformity with standard authorities, that the auditory canal in the average person is about one inch in length; that the false isthmus is about two-thirds of an inch from the ear drum. The evidence shows that the auditory canal in plaintiff's ear is about average. Dr. Padden testified that he packed plaintiff's ear with cotton about one-quarter of an inch outwardly from the eardrum and that he poured the plaster of Paris to within that distance of the eardrum and that it was necessary to pour it down into the osseous canal and to let it stand or harden for eight minutes before attempting to remove the same; that in that length of time it would attain the consistency of ''good hard butter''. Thus from a purely mathematical calculation it will be observed that the material would be poured past the false isthmus. The operation was really more of a mechanical than a surgical one. In such instances, it is not always neces-

sary to establish the allegation of negligence by medical testimony. It was said by the court in a somewhat analogous case,

"This is not the ordinary case where the practitioner is sought to be charged with liability for alleged improper treatment of some bodily ailment or infirmity. * * * It is a matter of common knowledge and observation that such things do not ordinarily attend the service of one possessing ordinary skill and experience in the delicate work of surgery. It does not need scientific knowledge or training to understand that, ordinarily speaking, such results are unnecessary, and are not to be anticipated if reasonable care be exercised by the operator. When they do happen then proof of other facts and circumstances having any fair tendency to sustain the charge of negligence will be sufficient to take the question to the jury". Evans v. Roberts, 172 Iowa 653 (154 N. W. 923).

It was a question for the jury to determine from the facts and circumstances whether the plaster of Paris mixture was poured past the false isthmus; if it was there was medical testimony to support the allegations of negligence.

■■■ These assignments are based on the court permitting a witness to testify as to the terms of a written instrument and what the instrument was intended to cover.

■ It appears that sometime after the injury, respondent made a settlement with his employer and executed an agreement in writing releasing the employer and its insurer only, from any claims from damages. This writing was introduced in evidence by defendant as purporting to show that plaintiff had been compensated in full for his injuries. In order to rebut that contention, plaintiff called as witnesses, a Mr. Swain, who was the attorney for the insurer of the employer

at the time of the injury and who prepared the release, and also called a Mr. Cuddeback, manager of plaintiff's employer at that time. These witnesses gave testimony, over the objection of defendant, as to what the release was intended to cover. The appellant is not a party, nor a successor in interest of any of the parties, nor were any of the parties a representative of defendant and, therefore, he cannot invoke the inhibition of the statute against parol testimony. Oregon Code 1930, § 9-212.

Finding no error, the judgment of the circuit court is affirmed.

RAND, C. J., BELT and ROSSMAN, JJ., concur.

---

Petition for rehearing denied June 13, 1933

ON PETITION FOR REHEARING
(22 P. (2d) 892)

█ CAMPBELL, J. Counsel for appellant has filed a motion for a rehearing for the reason that we failed to give sufficient attention to the fourth ground of defendant's motion for a directed verdict: "That on July 1, 1930, * * * plaintiff made settlement with the employer, Varney Air Lines * * *'' as shown by defendant's exhibit five.

Defendant's exhibit No. 5 reads as follows:

"Received of the VARNEY AIR LINES, INCORPORATED, San Francisco, California, the sum of THREE HUNDRED FIFTY and no/100 Dollars, said sum being the amount claimed by the undersigned claimant, to be due for compensation already incurred, covering the period from March 21, 1930 to June 28, 1930, excluding the first seven days, in consequence of injuries received by the undersigned claimant on or about March 21, 1930, while in the employ of VARNEY AIR LINES, INCORPORATED, and in consideration

of the payment of said sum and the assumption by said Corporation of liability under the terms of the Workmen's Compensation Law of the State of California, the undersigned claimant does hereby release and forever discharge the said VARNEY AIR LINES, INCORPORATED, from any and all obligations and liability except such as arises under the terms of said Act, and agrees that the payment of the balance of said compensation in due course as provided by said Act, shall extinguish all liability of whatever kind arising out of said injuries.

"And the said VARNEY AIR LINES, INCORPORATED, does in consideration thereof, agree to assume liability as provided by said Act and to make payments accordingly.

"Dated July 1st, 1930.

"Floyd E. Keadle

"Witnessed by:
"B. M. Freiberg
"E. L. Parke"

·Plaintiff introduced the evidence of the manager of the Varney Air Lines and Mr. Swain, the attorney for the insurer of the Varney Air Lines, to show what the above document was intended to cover, and we held in our original opinion that he had a right to do so. In addition, he introduced plaintiff's exhibit No. 15, showing what was the real understanding between him and the Varney Air Lines, which reads as follows:

"It is MUTUALLY UNDERSTOOD A N D AGREED BETWEEN THE Varney Air Lines, Inc., a corporation, and Floyd Keadle as follows:

"That on or about the 21st day of March, 1930, the said Floyd Keadle was in the employ of said Varney Air Lines, Inc., as a flyer and on said day, certain casts were fitted to said Floyd Keadle's ears by one Dr. E. H. Paddon and, said Floyd Keadle sustained certain permanent injuries to his head and sustained loss of

time from his labor, for which the said Floyd Keadle claims that Dr. E. H. Paddon is liable in damages as for malpractice to said Floyd Keadle;

"AND IT IS FURTHER UNDERSTOOD AND AGREED that the Varney Air Lines, Inc., carry a policy of compensation insurance covering injuries to their employees, regardless of fault, and said Varney Air Lines, Inc., through their insurers and themselves, are willing to pay the said Floyd Keadle the sum of Two Thousand Dollars ($2,000.00), conditioned that the said Floyd Keadle will agree not to sue the said Varney Air Lines, Inc., or their insurers.

"Now, therefore, in consideration of the premises, IT IS MUTUALLY AGREED between the Varney Air Lines, Inc., and Floyd Keadle that, in consideration of the payment of Two Thousand Dollars ($2,000.00) to said Floyd Keadle by the Varney Air Lines, Inc., and their insurers, the receipt whereof is hereby acknowledged, the said Floyd Keadle does hereby covenant and agree to and with the said Varney Air Lines, Inc., and their insurers, and all other persons, firms or corporations whatsoever, except Dr. E. H. Paddon; that said Floyd Keadle will not commence, bring or maintain any action at law or proceeding in any court to recover damages, compensation or any sum of money whatever against said Varney Air Lines, Inc., and this agreement is in no event to be construed to release said Dr. E. H. Paddon from liability on account of malpractice as herein mentioned.

"IT IS FURTHER MUTUALLY UNDERSTOOD between the Varney Air Lines, Inc., and their insurers that the said sum of Two Thousand Dollars ($2,000.00) is paid pursuant to workmen's compensation benefits, according to the schedules fixed by the California Workmen's Compensation Act; and, on account of the consideration aforesaid, the said Varney Air Lines, Inc., and their insurers do hereby agree to pay all doctor bills and hospital bills that have been incurred to the 1st day of April 1931, as a part consideration for this covenant.

"In Witness Whereof we have hereunto set our hands and seals this 1st day of April, 1931.

"(Sgd) FLOYD E. KEADLE,

VARNEY AIR LINES, INC.,

"By C. L. Swain (Sgd)

"B. M. Freiberg
"M. A. Hartman"

The cases principally relied upon by appellant *Donough v. National Hospital Association,* 134 Or. 451 (294 P. 351); *Williams v. Dale,* 139 Or. 105 (8 P. (2d) 578, 82 A. L. R. 922) are cases under the Oregon Workmen's Compensation Act for damages against physicians, who, it was alleged, were guilty of malpractice in treating an original injury for which the Workmen's Compensation Act made compensation, thereby causing aggravation of the injury. The Oregon Workmen's Compensation Act provides that any workman injured in the course of his employment, is entitled to be paid, "from the industrial accident fund" certain sums therein specified as compensation and "* * * the right to receive such * * * sums shall be in lieu of all claims against his employer on account of such injuries * * *". Oregon Code 1930, § 49-1814. It also provides for compensation for the aggravation of any injury occurring after the original injury.

The theory of the above cases was that the aggravation of the injury, if any, suffered by the injured workman, by reason of the acts of the physician, became a part of the original injury and was taken into consideration in the adjustment of the compensation by the Industrial Accident Commission according to the provisions of the statute. Therefore, the statute made the acceptance of the compensation awarded "in

lieu of all claims against the employer''. In the instant case, there was no original injury, therefore no aggravation.

Granting, for the sake of the argument only, that the Varney Air Lines and defendant were joint tort-feasors, the settlement made by the plaintiff and his employer is nothing more than a covenant not to sue and would not operate as a release of defendant.

''The well established rule of law is that the absolute discharge of one joint tort-feasor from liability on account of the alleged tort is a release of all the others. * * * There are some apparent variations from this doctrine. One is that an agreement not to sue one of the culpable parties is no bar to an action against the other. This depends upon the principle that joint tort-feasors are jointly and severally liable and that any individual against whom action is instituted cannot complain of the non-joinder of his fellows. It can make no difference in principle whether the non-joinder is a gratuity on the part of the plaintiff, or whether he has been moved to that course by monetary considerations. The authorities strongly support this apparent exception. Bell v. Perry, 43 Iowa 368; Texarkana Tel. Co. v. Pemberton, 86 Ark. 329 (111 S. W. 257); Louisville Times Co. v. Lancaster, 142 Ky. 122 (133 S. W. 1155); Matheson v. O'Kane, 211 Mass. 91 (97 N. E. 638, Ann. Cas. 1913B, 267, 39 L. R. A. (N. S.) 475); Smith v. Dixie Park & Amusement Co., 128 Tenn. 112 (157 S. W. 900); Robertson v. Trammell, 37 Tes. Civ. App. 53 (83 S. W. 258)''. Stires v. Sherwood, 75 Or. 108 (145 P. 645).

The petition for rehearing will be denied.

It is so ordered.