Argued November 6; reversed November 18, 1941

# LUDWIG *v.* ZIDELL ET AL.

(118 P. (2d) 1073)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Arthur I. Moulton*, of Portland (Moulton & Davis, of Portland, on the brief), for appellant.

*W. A. Palmer*, of Portland (E. L. McDougal and Randall S. Jones, both of Portland, on the brief), for respondents.

KELLY, C. J. At the time plaintiff sustained the injury for which he seeks to recover, namely, on De-

cember 16, 1939, he was, and for about three weeks had been, in the employment of defendants operating a machine known as the shears which consisted of two cutting blades approximately two feet long, powered by a gasoline motor and used in cutting scrap metal.

It is alleged in plaintiff's complaint that—

"In connection with said machinery, defendants had and operated by power a certain knuckle revolving with an eccentric motion, so devised that it was extremely hazardous and dangerous to any person coming in contact therewith, and defendants at said time had carelessly and negligently failed and neglected to cover and protect the said knuckle by guard or covering to prevent pieces of metal from dropping into and near said knuckle, and to prevent defendants' employes from coming in contact therewith."

It is also alleged in plaintiff's complaint that—

"It was practicable without impairing the efficiency of defendants' said machinery for defendants to have used the care and precaution of enclosing the aforesaid power driven knuckle with a guard and covering thereover and around the same so as to protect defendants' employes from coming in contact therewith, but defendants carelessly and negligently failed to use said or any care or precaution to protect their employes from said knuckle."

■ No claim is made by defendants that they were subject to the provisions of the Workmen's Compensation Act. For that reason in determining whether an order of nonsuit should have been made neither contributory negligence, knowledge of the danger nor assumption of the risk by plaintiff may be considered.

On this phase of the case, but two questions are relevant: (1) Is there substantial testimony tending to prove that defendants failed to comply with the provisions of the Employers' Liability Act as alleged

in plaintiff's complaint; and (2) if so, is there substantial testimony tending to prove that such violation of the Employers' Liability Act on defendants' part was the proximate cause of plaintiff's injury?

Defendants insist that there is no testimony tending to show a violation of the Employers' Liability Act by them; and also insist that, if any such testimony is in the record, there is nothing tending to prove that a violation of said act was the proximate cause of plaintiff's injury.

Tersely stated, defendants' position is that plaintiff himself was negligent in placing his hand in proximity to the revolving knuckle mentioned in plaintiff's complaint; and that plaintiff's alleged negligence in this regard was the sole proximate cause of plaintiff's injury.

In dealing with the question, whether there is substantial testimony tending to show that defendants failed to comply with the Employers' Liability Act, we are required to bear in mind the provisions of that act with respect to devices, care and precautions required of owners, contractors, etc., for protection and safety of employes in dangerous employments; and we should have in mind also the character of the machinery in suit, the duty of plaintiff in operating it, and the nature of the protection afforded plaintiff.

We quote the pertinent provision of the statute in this regard:

* * * "and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the

structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices." Vol. 7, O. C. L. A. pp. 596, 597, Section 102-1601.

As stated, the machine was known as the shears. Taking the description from plaintiff's testimony, the machine consisted of two cutting blades which met each other in operation. One blade was stationary; the other moved up and down to meet it. The blades were about two feet long. Pieces of metal were put between the two blades for cutting. The lower blade was about two and a half or three feet above the platform on which the machine stood. It was driven by a gasoline motor which was belted to the gearing, a crank and gear shaft which moved the upper blade up and down. The pulley on the gasoline engine was about six or seven feet from the pulley operated by the belt to the machine end. The machine was set up on a platform consisting of two timbers long enough to accommodate both the motor and the shears. The upper blade was connected to and operated by a connecting rod which stood approximately perpendicular and ran down to a knuckle or crank at the bottom. The crank at the bottom was designed to have a circular motion to produce an up and down motion on the connecting rod between the end of the shears and the crank. The connecting rod was approximately two and a half feet long. On the downward stroke of the lever, that worked the shears, it was just about level with the upper part of the platform. There was a place hollowed out in the platform about three or four inches deep; hewed out of the wood to permit the crank to turn. In its revolving motion, the crank cleared the bottom of this well by three or four inches. The diameter of the crank

was about eighteen inches or more. The shaft had two large gears on each end on each side of the knuckle. Two large gears were attached to the shaft. These gears were about four feet apart. The gear wheels would stand about four feet high and the knuckle was midway between them. The pulley extended from this machine back to the gasoline engine. The pulley was about an eighteen-inch pulley. It had two large flywheels on either side and the pulley connected to one of these flywheels. In between these two large flywheels were small gears that meshed with these large gears, and the large gears revolved the crank and knuckle.

The machine was set up north and south, the shears being north of the engine and facing north. The belt pulley was on the east side. There was no floor, but the whole machine was bolted down to the two timbers which were eighteen inches wide and formed a floor thirty-six inches wide. The space on this floor was vacant, but they kept some tools there on the floor on these two timbers.

All of this structure, except the shears, was enclosed in a shear house built out of two by sixes. This shear house was about four and a half feet high and about twelve feet long. It sloped back toward the motor. It was about a foot higher above the shears than it was over the motor. It was about four and a half feet high above the shears and tapered down to about three and a half feet over the motor. It had a flat roof covered with corrugated tin. It was about six feet wide, just wide enough to accommodate the motor and all of the shears, except the blades which merely stuck out of it on the north side. The rest of the machinery, the flywheels, gear wheels, pulley, belt and knuckle, and the motor were all in that house.

The estimated speed with which the shears operated was from thirty to fifty strokes a minute. The speed was regulated by a throttle on the dash right above the flywheel. The throttle controlled the feed of gasoline to the engine. The motive power of the gasoline engine was connected to or detached from the pulley that drove the belt supplying power to the shears, by means of a clutch which was directly between the flywheel and the dash or front end of the motor and extending about six inches above the flywheel on the motor. There was no brake by which the momentum of the shears could be overcome or checked when the machine was thrown out of gear by disengaging the clutch; and, at such a time, the machine would continue to run from a minute to a minute and a half thereafter.

On the east side of the shear house, in addition to the upright members of the frame consisting of two by sixes spaced about a foot apart, pieces of sheet iron were placed against the uprights and either nailed or bolted in such an insecure manner that at times they fell away from the uprights. These pieces of sheet iron, when they were in position, extended only to within eight inches or a foot of the top of the east side of the shear house. Scrap iron to be cut by the shears was unloaded at the east side of the shear house in piles from ten to fifteen feet high.

It was plaintiff's duty to start the motor every morning; see that it had plenty of water, check the oil on it, oil the shears, start the shears and cut the scrap iron. To oil the machinery it was necessary to go inside of the shear house. Plaintiff was the only employe operating the shears.

It was customary for plaintiff to be on the job doing the oiling, putting the water in the radiator and starting the motor before 7:30 A. M.

On the morning when plaintiff was injured, plaintiff had filled the radiator with water, oiled the machine and had just started it, putting the shears in gear when he noticed a clanking sound. It sounded as if two pieces of metal were hitting together quite hard. At that time, plaintiff was inside the gear house and about five feet from the gears. Upon investigating, plaintiff saw a piece of metal flopping back and forth in the well or hollowed out place in the wood some four inches or thereabout deep under the crank. Every time the knuckle would go round, it would hit the piece of metal.

We quote plaintiff's testimony:

"Q. And what did you try to do?

A. Well, my first thought was to get it out of there without tying everything up, the motor; so I reached in with my hand and grabbed hold of it, and I had it out before this knuckle, in revolving, caught my hand.

Q. You had the metal out before,—

A. (Interrupting) Yes, I picked the metal out,

Q. ——before the knuckle caught you, but as you got it out what caught you?

A. Well, I don't just exactly remember what did catch my glove, caught my hand, that finger, taking it around.''

Except the structure known as the shear house, there was no covering or enclosure of the connecting rod or the crank which drove it or any part of the gears that drove the shears when plaintiff was hurt. Defendants argue that this enclosing structure sufficed as a compliance with the provisions of the Employers' Liability Act above quoted.

Manifestly, pieces of scrap iron could have fallen through the aperture in the east side of the shear house above the upper edge of the corrugated tin which was fastened on that side of the structure as stated. It is equally plain that if the place hollowed out of the supporting base to accommodate the movement of the crank and knuckle and the moving parts of the machine at that point had been enclosed by housing or otherwise appropriately guarded, the piece of metal which plaintiff endeavored to remove would not have found lodgment there and plaintiff could not have placed his hand in such proximity to the knuckle as to get it caught and crushed.

■ Whether the installation of such protective guard or housing could have been made without impairing the efficiency of the machine is a question of fact.

■ Involved collaterally in considering the question of the practicability of proposed methods of guarding the machine is the question whether the failure to have installed such or any covering or guard was the proximate cause of plaintiff's injury. That too is a question of fact.

It is not contended that contributory negligence, if any, on plaintiff's part can be considered in determining whether an order of nonsuit should have been entered.

Defendants insist only that plaintiff's act in thrusting his hand into such close proximity to the knuckle as to get it caught was the proximate cause; and, while the failure, if any, to have the machine guarded might be deemed a contributing cause, it was not the proximate, but only the remote, cause of plaintiff's injury.

■ We are unable to follow defendants in this to the extent of holding that, as a matter of law, defendants'

failure to install protective covering or guards about the machine in suit was not the proximate cause of plaintiff's injury.

We think the question should have been submitted to the jury.

From plaintiff's testimony, it appears that plaintiff had been placed in sole charge of the machine in suit. It was his duty to take care of it. From the testimony before us, it appears that plaintiff was in the performance of that duty when he was hurt. It was the duty of defendants to use every device, care and precaution practicable to use for the protection and safety of plaintiff limited only by the necessity of preserving the efficiency of the machine.

In a case not controlled by the provisions of the Employers' Liability Act, but only by the principles of the common law, this court has said:

"By 'proximate cause' is not meant the last act of cause or nearest act to the injury, but such act, wanting in ordinary care, as actually aided in producing the injury as a direct and existing cause. It need not be the sole cause, but it must be a concurring cause such as might reasonably have been contemplated as involving the result under the attending circumstances." *Brown v. O. W. R. & N. Co.*, 63 Or. 396, 403, 128 P. 38.

■ The change made by the provisions of the Employers' Liability Act would alter the foregoing definition of proximate cause by substituting for the phrase, "but such act, wanting in ordinary care," a phrase to the following effect, "but such act of commission or conduct of omission violating or failing to comply with the provisions of the Employers' Liability Act."

In a case under the Employers' Liability Act wherein plaintiff's decedent, while entering upon an

elevator, sustained injuries resulting in his death, the duty, corresponding to that which rested upon defendants herein, is stated with his customary clarity by Mr. Justice RAND thus:

"Was there a device, not used by defendant, which it was practicable to use for the protection of defendant's employes and which, if used, would not have limited the efficiency of defendant's elevator and if used would have protected the decedent from the injuries which caused his death?" *Fromme v. Lang & Co.*, 131 Or. 501, 505, 281 P. 120.

It is true that in cases of this character the matter of properly presenting to a jury the question whether defendants' alleged misconduct was the proximate cause of plaintiff's injury has been involved in extensive judicial discussion. The language of the Supreme Court of the United States in an early case, however, is clear and cogent:

* * * "a careless person is liable for all the natural and probable consequences of his misconduct. If the misconduct is of a character which, according to the usual experience of mankind, is calculated to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse him, and the subsequent mischief will be held to be the result of the original misconduct. This is upon the ground that one is held responsible for all the consequences of his act which are natural and probable, and ought to have been foreseen by a reasonably prudent man." *Atchison T. and S. F. R. Co., v. Calhoun*, 213 U. S. 1, 53 L. Ed. 671, 29 Sup. Ct. 321.

We think that, when plaintiff rested his case in chief, this question should have been treated as a question of fact in order that opportunity might be afforded defendants to present their testimony thereupon; but an order of involuntary nonsuit should not

have been entered. *Hill v. Saugested,* 53 Or. 178, 98 P. 524, 22 L. R. A. (N. S.) 634.

In *Vanderflute v. P. R. L. & P. Co.,* 103 Or. 398, 404, 205 P. 551, cited by defendants, plaintiff, as an employe of the Portland Railway Light & Power Company was required to form a contact between a voltmeter at the curb and the rail of a street railway by means of a wire, to one end of which was attached a stick provided with a metal center, and the other end of the wire being attached to a voltmeter and a fire hydrant at the curb. While plaintiff was endeavoring to prevent a bicyclist from running over the wire, the bicyclist collided with plaintiff and fractured plaintiff's leg. In dealing with the propriety of an order of nonsuit as to the railway company this court said:

"There is no testimony that plaintiff was compelled to go into the street in the way of traffic or to expose himself to the danger of collision with vehicles while he performed his work. The very work in which he was engaged was subordinate to the right of vehicles to use the street."

In the case at bar, it is shown that plaintiff was required to enter the shear house in order to oil the machine and that customarily the clutch by which the motor was put in gear was operated from the inside of the shear house.

In *Brady v. Oregon Lumber Co.,* 118 Or. 15, 245 P. 732, 45 A. L. R. 812, "the plaintiff, not on the business of the defendant company, but voluntarily, chose to quit a place of safety supplied to him by it, and ventured on a journey of sixteen miles through four feet of snow, whereby his body was exposed to the frigid blasts that swept the snow clad mountain."

His injury did not arise out of or in the course of his employment.

In the case at bar, plaintiff was at a place furnished by defendants in the performance of his duty to his employers when he observed the metal piece, which in his opinion might cause serious damage to the machine in its contacts with the moving parts or injury to his own person by breaking and flying out and striking him.

*Kukacka v. Rock*, 154 Or. 542, 61 P. 2d 297, also cited by defendants, is a case where plaintiff was injured because her husband, who was driving the automobile in which plaintiff was riding, mistook a doctor signalling for him to stop and render assistance, for a robber, and veered off of the highway striking defendant's automobile which sometime before had upset in a ditch about ten feet from the traveled portion of the highway. The doctor, who had signalled plaintiff's husband, was not the agent or employe of defendant being merely one of defendant's guests.

The mere statement of the facts of the Kukacka-Rock case clearly distinguishes it from the case at bar.

In *Abbott v. Portland T. & S. Bank*, 160 Or. 699, 86 P. 2d 962, likewise cited by defendants, plaintiff contended that the proximate cause of her injuries was a defective switch. In that respect she alleged that—

"* * * although the previous user of said washing machine and wringer had attempted to turn off said power by using said switch, the power had not been turned off by reason of said defective switch, and as a result plaintiff's left hand was caught in between the rollers of said wringer and drawn into the same."

There was no evidence, however, that any "previous user of the washing machine and wringer had attempted to turn off said power by using said switch." In the case at bar the absence of a protective covering or

guard over or about the machine in suit is shown by direct and positive testimony.

*State ex rel. Boeving v. Cox*, 310 Mo. 367, 276 S. W. 869, differs from the case at bar in that there it is said that Petty, the employe, whose hand was injured in attempting to remove a stick from a hole in the screen of a boll extractor, could have continued to operate the boll extractor indefinitely without any danger of injury to himself from relator's negligence, had he kept his hand out of the moving machine. In the case at bar there is testimony from which the jury might find that broken parts of the metallic piece might have been thrown out upon plaintiff to his serious injury.

In *McCann v. Grider*, (Tex. Civ. App.) 83 S. W. 2d 708, it appears that the McCanns were in the business of operating their large farm so far removed from any public gin as to make it necessary for the owners to furnish their own ginning facilities. Accordingly, and being themselves without experience in the gin business, they engaged Grider, a ginner with several years of actual and active experience, to plan and build a gin house, to purchase and install the necessary machinery and equipment and to operate the plant when completed. Under this arrangement the gin plant was established in accordance with Grider's plans and under his supervision, including the selection and installation of the machinery and equipment utilized. And the gin house being completed to his liking, Grider assumed control and operation of the plant and continued the direction thereof until he suffered the injury of which he complained. In the case at bar, plaintiff had no voice in selecting the machine or in directing the manner of its installation. Moreover, in the Grider case, the machine was so nearly stopped that

it seemed to Grider to be entirely so when Grider put his hand into it to remove, not a metallic piece which might break and fly to pieces upon Grider's person, but merely the lint from the cotton then being ginned.

In discussing those cases from the sister jurisdictions of Missouri and Texas, cited by defendants, the question of contributory negligence seems to predominate. In so far as they hold that failure to guard dangerous machinery is not the proximate cause of injury to an employe, who, in the course of his employment, sustains an injury which would not have occurred if the machines had been guarded and which reasonably might have been anticipated, these cases are not in accord with the holdings of this court.

■ Plaintiff called Mr. Roy Wilehart, as an expert witness, and, after introducing testimony of his qualifications, propounded the following question to him:

"Q. Is it practical, without interfering with the operation of the machinery, to cover and protect that knuckle and the machinery with which it is connected?"

Defendants objected to the question on the ground that it called for an opinion on a subject that invades the province of the jury and is not in the field of expert testimony. The court sustained defendants' objection, and thereupon plaintiff offered to prove by the witness that it is practical to install a guard over the knuckle and the gears connected with it to completely cover it and prevent any person coming in contact with it, and to prevent any metal falling into it; and that such guard would not interfere with the operation of the machinery in any particular.

Plaintiff assigns error upon the ruling of the court in sustaining defendants' objection to the question.

The character of the machines under consideration was shown to be such that the question was a proper one to be submitted to an expert and the objection thereto should have been overruled. Vol. 22, C. J. Subject. Evidence, pp. 656, 657, § 755 19, note 13, citing *Supolski v. Ferguson, etc. Foundry Co.*, 272 Ill. 82, 111 N. E. 544.

The judgment of the circuit court is reversed and the cause remanded for such further proceedings as are not inconsistent herewith.