## SOUTHERN PACIFIC CO. v. RAISH.
### No. 13443.

United States Court of Appeals
Ninth Circuit.
May 29, 1953.

Koerner, Young, McColloch & Dezendorf, John Gordon Gearin and Oglesby H. Young, Portland, Or., for appellants.

Vergeer & Samuels and Charles S. Crookham, Portland, Or., for appellee.

Before MATHEWS and STEPHENS, Circuit Judges, and BYRNE, District Judge.

STEPHENS, Circuit Judge.

The Southern Pacific Company, a corporation, is here appealing from a judgment entered against it in the sum of $14,500. The jury returned a verdict in favor of Alma Raish, appellee, against appellant in the sum of $41,500 as compensation for injuries sustained by her. The sum of the verdict was reduced by the sum of $27,000 paid by another upon the same account.

It is undisputed that appellee was seated in an automobile parked upon the westerly shoulder of an Oregon highway some seventy feet south of appellant's highway overpass. A northbound truck, sometimes referred to in the record as the "red" truck, and a southbound Los Angeles-Seattle Motor Express, Inc., truck with trailer moved under the overpass simultaneously. The northbound vehicle swerved over the middle line of the highway, and the southbound Express vehicle swerved to the right so that its right side wheels were upon the packed graveled shoulder of the highway. The westerly shoulder under the overpass was seventeen inches wide and the easterly shoulder under the overpass was twenty-six inches wide. There was loose gravel on the shoulder. The Express truck's superstructure came in contact with a metal angle brace of the overpass structure or trestle[1] which extended over

---

1. The angle iron brace on the southwest corner of the overpass extends two inches over the pavement and meets the southwest abutting support of the overpass at a forty-five degree angle to the southwest abutment, about twenty-one inches below the horizontal part of the overpass. The top of the truck superstructure struck the brace at a point directly above the shoulder of the highway.

the highway shoulder, reducing the clearance, and the truck swerved to the left in the path of a northbound bus, then swerved sharply to the right, colliding with a parked car and hitting three more parked cars, coming to a stop upon contact with a telephone pole about two hundred fifteen feet south of the overpass. Appellee was in one one of the cars struck. The driver and truck with the trailer had passed under the overpass before.

Appellee claimed at the trial, and claims here, that the proximate cause of the accident was the negligent construction and maintenance of the angle brace causing an impaired clearance. It is appellant's view that the overpass gave legal clearance for *ordinary use* of the highway and that use of the shoulder was not an *ordinary use* of the highway. Further, appellant asserts that the Express truck was being driven at an unreasonable and imprudent speed, that it was not under the driver's control, was without adequate or effective brakes and proper or adequate steering mechanism, that the truck's superstructure was of excessive and unlawful height and that its driver failed to keep a proper lookout, that in the circumstances the injury was not a proximate result of any negligent act of appellant's.

The Express truck driver testified that he swerved to the right to avoid colliding with the oncoming truck, that the impact of the truck with the angle brace caused his vehicle to swerve into the path of the oncoming bus, that to avoid collision with it he swerved his truck to the right and contacted the other cars. He further testified that there was water in his brake drums and that he discovered after the accident that the brake petcock had been knocked off. A portion of the testimony of the driver will be set out later in this opinion by note 4.

The underpass was about twenty-four feet wide between the outer edges of the highway shoulders, but because the overpass and highway did not intersect at right angles the true horizontal clearance was twenty feet and seven inches. The paved highway was divided into one northbound lane and one southbound lane of near equal

width, the total pavement being seventeen feet in width. The clearance under the overpass, that is, between the overpass and the pavement, was twelve feet ten or eleven inches, but a metal angle brace impaired the clearance over the westerly shoulder of the highway. See note 1, supra. The Express truck and trailer were within the legal maximum as to size, height, and weight. At the time the truck hit the overpass angle brace, the truck was moving at the rate of thirty miles per hour.

Appellant contends that there was "ample clearance for the Los Angeles-Seattle Motor Express truck to pass through the underpass. According to Embleton's [the Express truck driver's] testimony, it was forced off the highway by the red truck. Therefore, appellee's charges that the overhead crossing was maintained at a height and width insufficient for the safe passage of persons making ordinary use of the highway is unsupported by the evidence. Even assuming that there was some satisfactory evidence of negligence on the part of appellant, such negligence was not the proximate cause of this accident."

Appellant further contends "that the negligence of the driver of the Los Angeles-Seattle Motor Express truck or the negligence of the driver of the red truck, or the concurrent negligence of each truck driver, constituted the sole, proximate cause of this accident. The contentions here stated are presented on this appeal in several forms, viz., objections to the matters submitted by the trial court to the jury, objections to the giving of certain instructions, the failure to give certain requested instructions, and the failure of the trial court to grant appellant's motion for a directed verdict or its motion for judgment notwithstanding verdict, or in the alternative for a new trial."

The Express company, preferring not to litigate appellee's claim against it for damages, paid appellee the sum of $27,000 in consideration of the receipt of an instrument signed by appellee and designated "Covenant Not to Execute". Appellant contends the instrument effected a complete release, while appellee contends it is in fact but a "Covenant Not to Sue" or in the

nature of a "Covenant Not to Sue". The trial judge agreed with appellee and so instructed the jury. We are in accord.

■ "[W]here the negligence of two or more persons concur in producing a single, indivisible injury, then such persons are jointly and severally liable, although there was no common duty, common design or concerted action." Murray v. Helfrich, 1934, 146 Or. 602, 30 P.2d 1053, 1054. The release of one of the joint or concurrent tortfeasors acts as a release of the others as well. Stires v. Sherwood, 1915, 75 Or. 108, 145 P. 645; Spiess v. Sommarstrom Ship Building Co., 9 Cir., 1921, 272 F. 109; Pacific States Lumber Co. v. Bargar, 9 Cir., 1926, 10 F.2d 335, 337; Murray v. Helfrich, supra. However, in many jurisdictions, among them the State of Oregon, the strict release rule may be avoided by use of a "Covenant Not to Sue". Keadle v. Padden, 1933, 143 Or. 350, 362, 20 P.2d 403, 22 P.2d 892, 893; McKay v. Pacific Building Materials Co., 1937, 156 Or. 578, 68 P. 2d 127; Stires v. Sherwood, supra; Pacific States Lumber Co. v. Bargar, supra. A "Covenant Not to Sue" preserves the legal cause of action while at the same time it bars the right of recovery from the particular person with whom the covenant is made. 76 C.J.S., Release § 44; Pellett v. Sonotone Corp., 1945, 26 Cal.2d 705, 160 P. 2d 783, 160 A.L.R. 863. In the latter case the Supreme Court of California, in construing an agreement essentially like one in suit, said: "On the other hand, the agreement does not purport to be, nor can it be construed strictly to be, a covenant not to sue, since it does not contemplate a cessation of the existing litigation, but on the contrary provides for continuation of the trial and places on defendant Compton the burden of defending the action until the rendition of a verdict or a nonsuit. However, since the plaintiff did not expressly or by necessary implication abandon or relinquish his claim or right of action, or agree to accept the payments in satisfaction of his claims, and since *the agreement according to its terms could not be pleaded by the covenantee as a defense to the action*, and

since the only agreement by plaintiff was that he would not levy execution on any property of the covenantee or make demand upon him for payment of the judgment or any portion thereof, we are of the opinion that it is closely akin to a covenant not to sue, that its legal effect should be held to be similar, and that it is not such an instrument as will operate to release other joint tort feasors." [Emphasis ours.] Pellett v. Sonotone Corporation, supra, 160 P.2d 783, at page 787[11].

The reason given in the Oregon cases, Stires v. Sherwood, supra, and Keadle v. Padden, supra, for holding a "Covenant Not to Sue" as no bar to a suit against a non-covenanting tortfeasor, is that joint tortfeasors are liable not only jointly but severally. It follows that as long as the cause of action survives, there is no cause for complaint by the one sued simply because another alleged joint tortfeasor is not sued.

■ The instrument in the instant case effectually prevents the plaintiff-appellee or anyone else from *enjoying any fruits of a suit against the alleged tortfeasor*, Express company, while it avoids a release of her claim for full compensation for her injuries through suit against another alleged tortfeasor. Of course, appellant is under no obligation to pay more than the total sum of the verdict less the sum received by appellee under the Covenant. And the court rendered the judgment to conform to these facts. In Pacific States Lumber Co. v. Bargar, 9 Cir., 1926, 10 F.2d 335, 337, there is quoted with approval the following from Smith v. Dixie Park & Amusement Co., 128 Tenn, 112, 120, 157 S.W. 900, 902: "'Indicia of a covenant not to sue may be said to be: No intention on the part of the injured person to give a discharge of the cause of action, or any part thereof, but merely to treat in respect of not suing thereon *(and this seems to be the prime differentiating attribute)*; full compensation for his injuries not received, but only partial satisfaction; and a reservation of the right to sue the other wrongdoer.'" [Emphasis

ours.] We recite the text of the instant covenant in the margin.[2]

■ The status of the document was a question of law, and as such was within the province of the court rather than of the jury. The fact that appellee was allowed to testify as to the intention of the parties in covenanting is of no moment. It was not error for the court to rule that the "Covenant Not to Execute" was in the nature of a "Covenant Not to Sue" and therefore was not a release of the cause of action against appellant.

Concerning points raised as to instructions to the jury: The Oregon law, as shown by Section 2–111, O.C.L.A., provides:

"That evidence is deemed satisfactory which ordinarily produces moral certainty or conviction in an unprejudiced mind. Such evidence alone will justify a verdict. Evidence less than this is denominated insufficient evidence."

Appellant submitted, and the court declined, to give an instruction which embodied the essentials of this code provision and instead gave the following instruction:

"The law imposes upon the party who claims that another is at fault the necessity of proving that claim by evidence. The claim must be proved not only by evidence but also by the greater weight of the evidence. This is known as the preponderance of the evidence. Preponderance of the evidence does not mean the greater number of witnesses but the greater weight and the convincing character of the evidence that is introduced. * * *."

■ It would have been proper for the court to give an instruction containing the essentials of the code provision, Metropolitan Casualty Ins. Co. of New York v. N. B. Lesher, Inc., 1935, 152 Or. 161, 52 P.2d 1133, 1139; Gwin v. Crawford, 1940, 164 Or. 215, 100 P.2d 1012, 1015; but the question here is: Was such an instruction necessary? The Supreme Court of Oregon has spoken decisively on the question. In McVay v. Byars, 1943, 171 Or. 449, 138 P.2d 210, 213[4], the cases are collated and reviewed. Therein, as in the instant case, the trial court had not given the code provision although it had been requested, but gave a proper "preponderance" instruction. The Court held that the refusal to give the requested instruction was not reversible error, saying: "The code section upon which such instruction is based is but one of many rather futile attempts to explain the meaning of 'preponderance of the evidence', * * *. The legislature not having commanded that the 'moral certainty' rule be given to juries * * * and the requested instruction being cautionary only, no error was committed in refusing to give it." To the same effect is Willoughby v. Dris-

2. "Covenant Not To Execute. Know All Men By These Presents: That I, Alma M. Raish, widow of Ivan C. Raish, of Eugene, Lane County, Oregon, for myself and all my legal representatives, in consideration of the sum of Twenty-Seven Thousand Dollars ($27,000.00) to me in hand paid by Los Angeles-Seattle Motor Express, a corporation, receipt whereof is hereby acknowledged, do hereby now and forever covenant and agree to and with the Los Angeles-Seattle Motor Express, a corporation, that I will not at any time or in any manner transfer, sell, assign or set over unto any person, firm or corporation any Judgment which I might procure or acquire as based upon personal injuries or property damage sustained by me in an automobile accident which occurred on or about October 17, 1950, near the overhead cross-ing maintained by Southern Pacific Company on Highway 99 south of its junction with Highway 28 in Lane County, Oregon, against Los Angeles-Seattle Motor Express, a corporation, and that I further covenant and agree that I will not cause to be issued any execution whatsoever as based upon any Judgment procured or acquired by me in any Court, State or Federal, in which action might be commenced naming Los Angeles-Seattle Motor Express as defendant.

"In Witness Whereof I have hereunto set my hand and seal on this 26th day of July, 1951.

"Alma M. Raish.

"Executed in the Presence of

"C. E. Luckey
"L. G. Raish"

coll, 1942, 168 Or. 187, 205, 206, 120 P.2d 768, 121 P.2d 917, 919. We hold that no error was committed on this point.

██ ██ Appellant offered, and the court refused to give, an instruction that there was no evidence to support the charge that appellant was guilty of negligence in constructing and maintaining its overhead crossing at a height insufficient for safe passage of persons making ordinary use of the public highway. We think the court was right in refusing the proffered instruction and was right in submitting the question embodied in the proffered instruction to the jury.

██ ██ Appellant seems to argue that ordinary use of the highway comprehends the paved lanes to the exclusion of the shoulders and that it had no duty of providing clearance above the shoulders. It seems so obvious that the shoulders of a highway are for the use of traffic when circumstances indicate their usefulness,[3] that more than the statement to that effect is surplusage. However, the Oregon law in section 115–401, O.C.L.A., defines "Street" or "Highway" as,

> "The entire width between property lines of every way or place of whatever nature when any part thereof is open to the use of the public, as a matter of right, for purposes of vehicular traffic."

It would seem to follow that it would be negligence on the part of anyone to construct or maintain any object over the area without clearance for lawful vehicles.

Appellant quotes from Krause v. Southern Pacific Co., 1931, 135 Or. 310, 295 P. 966, 968, 969, to the effect that: "It was the duty of the railroad company to so construct its trestle as to afford clearance for ordinary vehicular traffic." But there is nothing in the opinion to indicate that the use of the highway by the Express truck in our case was anything but a unit of "ordinary vehicular traffic". The opinion is well worth reading in connection with our case, as there is a striking sentence quoted

therein from 43 Corpus Juris 1089: "'A traveler upon a street is not bound at his peril to discover every defect or obstruction, although it may be an open one especially when his attention is diverted by other sufficient cause.'" [Revised without change of meaning in 63 C.J.S. Municipal Corporations § 851.]

██ Appellant offered an instruction to the effect that there was no evidence to support plaintiff's allegation that the "* * * overhead crossing [was of] a width insufficient for the safe passage of persons making ordinary use of a public highway." This point is based upon appellant's contention that its duty was legally performed when it constructed and maintained the overpass so that there was clearance for trucks traveling in the paved lanes. In other words, the overpass must have clearance for ordinary traffic use and any vehicular use of the shoulder is not *ordinary* use as a matter of law. Our treatment of other points herein shows our dissent from appellant's conclusion on this point. We approve the court's instruction that vehicular traffic was entitled to use the entire highway including the shoulder.

Appellant states in its reply brief that "* * * the Oregon Supreme Court held in the Prauss [v. Adamski] case [see footnote 3, supra, for citation] that the mere fact that a driver leaves the paved portion of the highway raises an inference of negligence on the part of the driver." We discover no such holding in the cited case. On the contrary the court said, 244 P.2d at page 605: "[15] However, it must be borne in mind that a driver of a motor vehicle has a lawful right to drive on the gravel shoulder of the highway on his own right-hand side whenever such gravel shoulder is suitable for travel. In other words, the mere fact that one drives the whole or any part of his automobile on the gravel shoulder does not constitute negligence in and of itself, nor is such driver guilty of negligence in leaving the paved portion of the highway to drive on such shoulder, if it

---

3. Holding to that effect are: Zahara v. Brandli, 1939, 162 Or. 666, 94 P.2d 718, 723; Oja v. LeBlanc, 1949, 185 Or. 333,

203 P.2d 267, 270; Prauss v. Adamski, 1952, 195 Or. 1, 244 P.2d 598, 605.

may be done in reasonable safety. But there might be conditions under which it would be negligence for the driver to leave the paved portion of the highway with any part of his vehicle. Each case necessarily depends upon its own facts and circumstances."

The facts and circumstances of the cited case were that the car was driven with the whole roadway to the driver, the shoulder was from one to seven inches abruptly lower than the paved portion. The rear right wheel went off the pavement onto the shoulder at a point where the shoulder was five to seven inches below the pavement. The facts and circumstances are radically different in the cited and in the instant cases.

■ Appellant complains that the court refused to give a requested instruction in regard to the duty of keeping vehicle brakes efficient to definite figures provided by Oregon law, 8 O.C.L.A. Sec. 115–376(e). A short quotation from Smith v. Pacific Northwest Public Service Co., 1934, 146 Or. 422, 29 P.2d 819, 822, disposes of this point: "The instructions requested do not embrace all the essential elements of the terms of the brake testing statute under consideration." The brake test must be on a "dry, hard, approximately level stretch of highway, free from loose material * * *." Again, the use of the shoulder is raised. If the tendered instruction should be given in any case it would seem definitely improper where the use of the gravelly and rough shoulder in an emergency was used. There

is evidence that the lack of braking power was first noticed after the first impact and explained by the discovery that the air brake was not functioning because the petcock had been knocked off. The driver also testified that there was water in the brake drums—a fact which he deduced from the poor performance of his brakes.

■ Another specification of error is based upon the court's failure to submit to the jury appellant's pretrial contention that "[h]e [the truck driver] operated said truck at a time when the same was equipped without adequate or proper steering mechanism thereon." There is no evidence at all to sustain such contention. There is no evidence that proper and adequate steering mechanism was not installed upon the truck nor that it was working defectively at any time prior to the truck coming into contact with the first car hit after its impact with the angle brace. The driver's testimony is that the steering mechanism worked to bring the truck to the right to avoid colliding with the northbound bus. Immediately after the turn to the right from the path of the bus, the truck was bearing down upon and plunged into the tan car, the first car hit, and the impact "impaired the steering mechanism so I couldn't get it to work, and in the meantime, I thought it was funny that I wasn't slowing down at all. Later I found that during the course of the time this was happening, the pitcock [sic] on the airbrakes had gotten knocked off and I had no brakes." We quote from the cross-examination of the Express truck driver in the margin.[4] We hold with the

---

4. On cross-examination the driver testified as follows:

"Q. You say the impact of your truck and the underpass lurched you to the left toward the center lane? Did you lurch toward the center line? A. It did.

"Q. You didn't cross the center line? A. I was too busy, I didn't notice, but I didn't go very far over there.

"Q. You were able to turn the truck all right? A. Yes, I did.

"Q. Will you tell the Jury why you couldn't turn to the left again when you knew you were going to hit Mrs. Raish's car? A. As far as I know, I would say my steering mechanism was impaired."

*    *    *    *    *

"Q. You had some trouble with the steering of your truck, as I understand it? A. Well, after the impact, yes.

"Q. The only part of your truck that came into contact with the underpass was the upper right corner, wasn't it? A. Yes.

"Q. Could your steering difficulty be caused by the wet pavement or gravel on the road, rather than something wrong with the steering mechanism? A. No."

*    *    *    *    *

"Q. Can you give us any explanation now of why your truck would not respond when you tried to turn it to the left? A. No, I can't."

trial court that there was no evidence in support of the specification of error.

As to safe passage under the overpass, it is accurate to say, as appellant says in its opening brief, that the issue of appellant's negligence concerns the charge that the overpass was of insufficient height and width for the safe passage of persons making ordinary use of the highway. In what we have already said, it is patent that we are of the opinion that the issue was properly given the jury and that there was evidence to support the verdict that appellant was negligent.

In arriving at our conclusion, we have considered appellant's quotations of definitions and Oregon code provisions and the argument based thereon. The following from Black's Law Dictionary (3rd Ed., 1933) is cited as defining the word "ordinary":

"Regular; usual; common; often recurring; according to established order; settled; customary; reasonable; not characterized by peculiar or unusual circumstances; belonging to, exercised by, or characteristic of, the normal or average individual."

From this definition appellant argues that the intentional swerving to the right of the Express truck to avoid collision with the red truck which had invaded the southbound traffic lane was not an ordinary use of the highway. And in connection with the definition and its argument, it considers the following: That traffic on Oregon highways is regulated by Sections 115–301 to 115–383, O.C.L.A.; that by Section 115–327, O.C.L.A., subdivision (c), it is required:

"In approaching any bridge, viaduct or tunnel, or approaching or crossing a railroad right of way or an intersection of highways, the driver of a vehicle shall at all times cause such vehicle to travel on the right half of the highway unless such right half is out of repair and for such reason impassable. This provision shall not apply upon a one-way street."

Subdivision (b) of Section 115–328, O.C.L.A. requires:

"A vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

Appellant also quotes the court's instruction to the jury:

"[T]he defendant * * * had a right to assume that all persons driving vehicles upon the highway would obey the law and would not drive in a careless and negligent manner."

Nothing could be more certain than that the red truck was disobeying the law when it passed over the center line of the highway. And nothing could be clearer than that the Express truck had a right to take reasonable action in the emergency to avoid the imminent collision. Such reasonable action need not be the best possible action. Of course, it was the duty of each truck driver to use his own lane of traffic when such use was open to him. Of course, one using the highway has the right to assume that others using the highway will not drive carelessly or negligently.

We do not regard these rules of the road as even intimating that the mere use of the highway shoulder to avoid an imminent and unexpected collision constituted action which exculpated appellant from the charge of negligence for maintaining an impaired clearance of any part of the highway. The word "ordinary" is peculiarly one of comparison. In one sense, straight driving at a legal rate of speed in the proper traffic lane may be ordinary use of the highway. But such use of the highway is not the only "ordinary" use. It could hardly be argued that it would not be the ordinary use of the highway for one driving in the stream of traffic to pull over onto the shoulder in bringing his vehicle to a stop, we will say, because of a flat tire. The use of the shoulder would seem "ordinary" to avoid any sudden happening which obstructed the safe use of the entire paved traffic lane. This comment would seem unnecessary in view of the Oregon case authority respecting the use of the highway

shoulders by motorists; however, we choose to refute the argument that the words "ordinary use of the highway" mean only the uneventful motoring on the paved lanes of a highway.

Without reciting the facts of Lorentz v. Public Service Ry. Co., 1926, 103 N.J.L. 104, 134 A. 818, 820, 49 A.L.R. 989, cited by appellant, we express our opinion that it is not in point. We conclude that the court did not err in refusing to direct a verdict in favor of appellant or to enter a judgment for appellant notwithstanding the verdict.

Appellant in its reply brief expresses disagreement with appellee's statement in her brief that the photograph of the overpass (Exhibit 4) "shows considerable wear and tear [to the overpass] presumably from the passage of traffic and vehicles which came in contact with this bulkhead," and proceeds to state that there is no evidence in the record that the appellant had actual or constructive notice of dangerous conditions at the overpass. We attribute no importance to the presumption indulged in by appellee, nor to appellant's statement as to notice. Appellant was well aware of the position of the brace in its relation to the highway. Its position was or was not a negligent one with or without notice of happenings in relation thereto.

We are of the opinion that there was sufficient and satisfactory substantial evidence upon which to leave with the jury, under proper instruction of the law, the question as to whether the maintenance of the metal angle brace by the appellant was negligence and that such negligence was a proximate cause of the happening which injured appellee.[5]

In all likelihood there would have been no accident at all had the red truck not crossed the center line; and in all likelihood there would have been no accident at all had the Express truck not struck the metal brace. At any rate these questions were for the jury. Here, there are two acts of negligence, each related, but neither Hill v. Jacquemart, 1921, 55 Cal.App. 498, 203 P. 1021, 1022, nor Aune v. Oregon Trunk Ry., 1935, 151 Or. 622, 51 P.2d 663, nor Daniels v. Cranberry Fuel Co., 1932, 111 W.Va. 484, 163 S.E. 24, all cited by appellant, nor other cases cited, can be construed as excusing the second negligence in a series of negligent acts. See Stool v. Southern Pacific Co., 1918, 88 Or. 350, 172 P. 101, 108; Stamos v. Portland Electric Power Co., 1929, 128 Or. 310, 274 P. 915, 917.

Finally, appellant claims that even if it was negligent as charged, the negligence of the Express truck driver in driving a vehicle with brakes not properly functioning and with insufficient steering mechanism constituted a "superseding cause" and relieved appellant of liability. The assumption of the premise is in direct contradiction of the jury's finding of fact. It is inherent in the verdict that the jury concluded that any deficiency of the brakes and of the steering mechanism of the Express truck was caused by the first car impact which in turn was caused by the loss of the truck control through the impact with the metal brace of the overpass.

Affirmed.

---

5. The question of proximate cause is for the jury. Ludwig v. Zidell, 1941, 167 Or. 488, 496–500, 118 P.2d 1073, 1077; Smith v. Shelvin-Hixon Co., 9 Cir., 1946, 157 F.2d 51, 59, 60.
For the Oregon state rule as to proximate cause see: McMillen v. Rogers, 1944, 175 Or. 453, 154 P.2d 219, 222; Aune v. Oregon Trunk Ry., 1935, 151 Or. 622, 632, 51 P.2d 663, 667; Stool v. Southern Pacific Co., 1918, 88 Or. 350, 172 P. 101, 104.