Argued April 15; affirmed May 11; rehearing denied June 15, 1937

# McKAY *v.* PACIFIC BUILDING MATERIALS CO. ET AL.

(68 P. (2d) 127)

*James Arthur Powers*, of Portland (Philip A. Joss, of Portland, on the brief), for appellants.

*K. C. Tanner*, of Portland (Green, Tanner & Boesen, of Portland, on the brief), for respondent.

KELLY, J. The Dinwiddie Construction Company of San Francisco, California, obtained a contract to

construct 12 large storage tanks at East Lewis and River streets in Portland, Oregon. One side of the property on which these tanks were to be constructed lies contiguous to the Willamette river. Pier holes about 30 inches in diameter were drilled to a depth of about 35 feet into which concrete was poured. These pier holes were in rows about four feet apart. This concrete was furnished by the defendant, Readymix Concrete Company, and hauled to said premises in trucks upon which the name of said defendant, Readymix Concrete Company, was painted; but defendants claim that said trucks were owned and operated by defendant, Pacific Building Materials Company.

Mounted on these trucks were metal hauling tanks, or containers, barrel shaped, and equipped with a hydraulic hoist, which hoist raised the tank at the end near the driver's seat and the other end of the tank tilted downward permitting concrete to run out of its own weight. There was a cap opening on top of the tank through which mixed concrete was poured into the tank. This was done through means of a loading chute under which the trucks were driven at the Readymix Concrete Company's plant. There was a metal chute door near the bottom of the rear end of the tank. This chute door moved upward flush with the end of the tank and was operated on a worm shaft by cog wheels turned by a detachable crank made of iron rod 14½ inches in length with a handle of four prongs. This crank, when fitted in place for turning was about a foot and a half above the tank bottom. The prong end of the crank handle when in position for turning extended out on the left-hand side to a position approximately over the left rear fender. The rear of the tank was attached at the bottom to the hoist frame by means

of two hinges, which hinges were bolted through the hoist frame with 2½" x ⅝" bolts. The hoist frame was so constructed that the tank when tilted to a 60-degree pitch came in contact with a heavy steel protrusion which was part of the hoist frame the purpose of which was to prevent further tilting and to prevent the tank from toppling over. There was a chain, one end of which was attached to the bottom of the tank at about the middle thereof, and the other end to the truck frame. The purpose of the chain also was to prevent further tilting when the tank had been tilted to an angle of about 60 degrees.

The truck was operated by an employee of the defendant, Pacific Building Materials Company. A sales ticket accompanied each load of cement. On the top of the sales ticket that accompanied the cement, the attempted unloading of which caused plaintiff's injuries, appear the words, "Readymix Concrete Company". On the bottom of this sales ticket in small type appears the following:

"It is specifically agreed that Readymix Concrete Co. will not be held liable for any damage done to shrubbery, flowers, roadway or private property in delivering the above material on these premises."

On the afternoon of April 12, 1934, this load of mixed concrete was delivered on said premises. The truck driver was instructed by the Dinwiddie Construction Company's men where to place the truck for unloading. These men attached a metal chute which ran from the tank chute door to a pier hole. The driver of the truck cranked open the chute door, and, aided by men using rakes, unloaded about half of the load.

The Dinwiddie Company, having experienced trouble with the consistency of the concrete in other

holes, because of the seepage from the river, had ordered a drier mix for this load.

When about half of the load had been discharged, there is testimony to the effect that the Dinwiddie Company's foreman told the truck driver to move the truck ahead. This is denied by the truck driver, who testified that he was told to hoist the tank in order to let the remaining concrete slide out.

The truck driver hoisted the tank whereupon it toppled over upon plaintiff injuring him. The testimony for plaintiff is to the effect that the safety chain, above described, was old and worn and that it broke thereby releasing the tank. The testimony for defendants disclosed that the bolts, which had secured the left tank hinge to the frame, were sheared off and the chain hook had spread apart, but the chain itself was not broken.

Plaintiff's duty was to attend the portable pump in use for pumping water out of the pier holes preparatory to putting the concrete mixture therein. Owing to the seepage from the river, this pumping had to be done immediately before the concrete was poured into the hole. At the time he was injured, plaintiff was handling the hose connected with said portable pump.

The Dinwiddie Construction Company had rejected the state Workmen's Compensation Act and had secured a policy of insurance issued by the Pacific Indemnity Company covering damages and claims of damages by its employees. Both defendants, Pacific Building Materials Company and Readymix Concrete Company, and their employees, were subject to the Workmen's Compensation Act.

The negligence charged by plaintiff consisted of: (a) Failure to warn plaintiff of intention to hoist con-

crete tank; (b) operating said hoisting equipment with a defective safety chain; (c) operating said truck when workmen were in and about the same; (d) failure to obey the order to move said truck forward; (e) violation of Employers' Liability Act; and (f) delivering concrete in truck and body not suitable for that purpose. This last specification of negligence was made by amendment to conform to the testimony during trial.

Defendants answered, denying all allegations of negligence, admitting that through latent defect a hook on the end of the safety chain had spread apart; that the body had toppled over, and that plaintiff had suffered certain injuries. The answer also set forth as a plea in abatement, although not in the approved form thereof, that plaintiff had entered into an agreement with plaintiff's employer and said employer's insurance carrier, whereby plaintiff had been paid compensation and was entitled to continue to receive compensation in accordance with and in the amounts specified in the Oregon Workmen's Compensation laws, said payments having been made and to be made by his employer's insurance carrier; that in and by said agreement and policy of insurance with endorsements thereon under which compensation payments had been made and were to be made to plaintiff, the Pacific Indemnity Company, as insurance carrier for plaintiff's employer, had attempted to exact from plaintiff and to require plaintiff to pay it, the said insurance company, any sum or sums that plaintiff might recover, on account of his alleged injuries, either in this action against these defendants or in any other action; that if any recovery is made in this action, plaintiff, under the terms of the policy of insurance, endorsements thereon and his compensation agreement with said insurance company, is required to pay to said company

out of any money so recovered an amount sufficient to repay said insurance company for all sums of money paid by it to plaintiff under its said policy and agreement, together with all sums of money or obligations incurred or to be incurred by said insurance company for doctor and hospital bills and other medical treatment and attendance procured for plaintiff, and that under said policy of insurance, endorsements thereon, and agreements and understandings existing between plaintiff and Pacific Indemnity Company, plaintiff has subrogated his right or cause of action for his said injuries; and said Pacific Indemnity Company is the real party in interest in the cause herein.

In bar, the answer also sets forth affirmative defenses: (a) Negligence of Dinwiddie Construction Company in placing and requiring plaintiff to work in a dangerous position and contributory negligence of plaintiff; (b) that plaintiff was receiving full compensation for the same injuries through compensation payments being paid him by his employer's insurance carrier in accordance with the Oregon Workmen's Compensation Act; (c) that plaintiff had released his employer and the insurance carrier; (d) that the allegedly defective hoisting equipment had been purchased from a reputable manufacturer of such equipment; that similar equipment was in general use; that said manufacturer had installed said equipment on defendant's truck, and defendant had relied on said manufacturer to furnish safe and proper equipment; that defendant had no notice of any defect in the equipment and that the alleged defect was a latent one which was undiscoverable through inspection; and (e) that plaintiff is barred from bringing an action against the defendants; that plaintiff has elected to take full compensation from his employer or his employer's insurance car-

rier and has waived any right he might otherwise have had to prosecute these defendants inasmuch as plaintiff sustained his injuries while working at the plant of the Dinwiddie Construction Company over which plant and premises and operations thereon his said employer had supervision and control, and said accident to plaintiff occurred while the truck was being operated by an employee of defendant, Pacific Building Materials Company, in the course of said employee's employment subject to and at a time when both defendants herein and said operator of said truck were operating under and subject to the Oregon state Workmen's Compensation Act, and that plaintiff agreed to accept and has accepted compensation payments made on behalf of his said employer and subject to and in accordance with the amount specified in and provided for in said Workmen's Compensation Act.

The reply put in issue all the material allegations of the answer.

██ The agreement executed by plaintiff and the Pacific Indemnity Company and the payments made and to be made thereunder constitute the basis of the defenses herein of accord and satisfaction, election to accept compensation under the Workmen's Compensation Act, release of defendants by reason of release and discharge of the Dinwiddie Construction Company; bar of plaintiff's action against defendants, as third parties, under section 49-1814, Oregon Code 1930, as amended by Oregon Laws 1933, Ch. 314; and of defendants' plea in abatement.

Omitting signatures, that agreement is as follows:

"COVENANT NOT TO SUE AND AGREEMENT.

THIS AGREEMENT, made and entered into this 30th day of April, 1934, by and between Arthur McKay, of

Portland, Oregon, hereinafter sometimes referred to as the 'employe', and the Pacific Indemnity Company, a California corporation.

WITNESSETH: Whereas, on April 12th, 1934, the employe was in the employ of the Dinwiddie Construction Company, a corporation, on a construction job at Portland, Oregon, and was injured by a tank falling upon him from a concrete mixer truck belonging to the Ready Mix Concrete Company, a corporation, and

WHEREAS, at said time there was in effect a policy of employer's liability insurance, issued by the Pacific Indemnity Company to the Dinwiddie Construction Company, which policy provided, among other things, for the payment by the Pacific Indemnity Company, under certain circumstances to employes of the Dinwiddie Construction Company, of the amounts which would have been payable to such employe under the Workmens Compensation Act of the State of Oregon if the Dinwiddie Construction Company and such employe had both been subject to such Act, regardless of whether the injury was caused by any negligence on the part of the Dinwiddie Construction Company or not, and

WHEREAS, the employe desires to accept such payments from the Pacific Indemnity Company, but does not desire to waive any cause of action he might assert against Readymix Concrete Company because of his injuries,

Now THEREFORE, the parties agree as follows:

(1) Pacific Indemnity Company agrees to pay to the employe the entire amount of any sum payable and all installments thereof, as they become payable, as provided by the Workmens Compensation Act of the State of Oregon, now in effect, for an injury such as that suffered by the employe, until such time as the employe's disability shall cease, or other conditions shall arise, which, according to the provisions of such law, would operate to terminate the compensation payments. In addition thereto, the Pacific Indemnity Company agrees to pay for the benefit of the employe, but

only through the physicians, surgeons and/hospitals designated by the Pacific Indemnity Company, the proper cost of whatever medical, surgical, nurse or hospital services, medical or surgical apparatus, appliances and medicines which are included in the provisions as benefits under the Workmens compensation law of the State of Oregon. If a dispute shall arise between the Pacific Indemnity Company and the employe with respect to the termination of payment of compensation, or medical attention, or with respect to any claim for permanent partial disability, or the amount thereof, such dispute, question or questions shall be submitted to a Board of Medical Arbitrators, one to be selected by the Pacific Indemnity Company, and the other by the employe; if these two are unable to agree, these medical arbitrators shall call in a third duly licensed physician and surgeon, and the findings of two of the medical arbitrators shall be binding upon both the Pacific Indemnity Company and the injured employe. No cause of action shall arise or suit be sustained on this contract, except upon an award duly made by medical arbitrators as provided above. The employe and the Pacific Indemnity Company shall each pay his or its physician and surgeon growing out of such medical arbitration, and shall divide equally the expense of the third physician and surgeon, if called.

(2) In consideration of the agreement to pay such compensation the employe covenants that he will not commence or prosecute any action or suit against the Dinwiddie Construction Company, a corporation, or any of its officers or employes for damages or expenses on account of personal injuries or loss or damage to property growing directly or indirectly out of said accident heretofore referred to, and will refrain from commencing or prosecuting any action or suit against the Dinwiddie Construction Company or any of its officers or employes, on account thereof. The employe, however, expressly reserves the right to an action or actions, suit or suits against the Ready Mix Concrete Company, a corporation, its officers and employes, or any other person, partnership or corporation whatso-

ever (except the Dinwiddie Construction Company, its officers and employes, and the Pacific Indemnity Company) for damages and expenses growing directly or indirectly out of said accident heretofore referred to.

(3) In further consideration of said promises of the Pacific Indemnity Company, the employe agrees that if he prosecutes any action or suit for damages against the Ready Mix Concrete Company, for damages or expenses growing directly or indirectly out of said accident, or makes any settlement therefore with Ready Mix Concrete Company, that he, said employe shall repay to the Pacific Indemnity Company the full amount paid to him by the Pacific Indemnity Company, but not more than the net amount received by the employe out of such action, suit or settlement, it being the intent of the parties that any moneys received by the employe from any such action, suit or settlement, shall first be applied to the reimbursement of Pacific Indemnity Company, and the balance, if any, above the amount paid to the employe by the Pacific Indemnity Company shall be retained by the employe.

In Witness Whereof, the employe has hereunto set his hand, and the Pacific Indemnity Company has caused this instrument to be executed by its duly authorized representative, both on this 30th day of April, 1934, at Portland, Oregon.''

The authorities are in conflict as to the effect of such an agreement as the one above set out; but this court has recognized the rule which construes such an agreement as a covenant not to sue: *Keadle v. Padden,* 143 Or. 350, 362 (20 P. (2d) 403, 22 P. (2d) 892). The subject is discussed, and authorities cited, in 53 C. J., Subject, Release, p. 1263, § 80; 58 L. R. A. 293, 92 Am. St. Rep. 882; *Murray v. Helfrich,* 146 Or. 602, (30 P. (2d) 1053).

Giving said agreement the construction above indicated, namely, that it is a covenant not to sue, renders

untenable defendants' first three assignments of error. In and of itself alone, it does not evidence an accord and satisfaction. As stated, the trial court gave it the effect of a pro tanto discharge. If there had been no requirement on plaintiff's part to reimburse the indemnity company, such a ruling would conform to the weight of authority. The agreement does not evidence an election of remedies as to the defendants herein, nor a release of joint tort-feasors.

The basis of defendants' contention that there was an election of remedies by plaintiff is found in the terms of the agreement whereby the "Pacific Indemnity Company agrees to pay plaintiff the entire amount of any sum payable and all installments thereof as they become payable as provided by the Workmen's Compensation Act". In those jurisdictions where the employer is required to pay the compensation awarded by the accident commission, there would be much force in the contention thus made; but in this jurisdiction the payment of such an award is made from a fund collected by the commission from premiums based upon the amount of the employer's pay roll.

There is nothing in the agreement between plaintiff and the Pacific Indemnity Company binding plaintiff by the terms of the Workmen's Compensation Act except as to the amount of compensation paid and to be paid by said indemnity company to plaintiff. The reservation therein by plaintiff of the right to sue the Readymix Concrete Company, or any other person, firm or corporation, negatives the suggestion that plaintiff thereby bound himself by the provision of section 49-1814, Oregon Code 1930, as amended by chapter 314, Oregon Laws 1933, page 486, which provides that only an injury deliberately intended may be the

basis of an action against a third person not in the same employ if, at the time of the injury, such third person or his workman, causing the injury, was engaged in the course of an employment subject to the Workmen's Compensation Act.

Defendants assign error because in his argument to the jury plaintiff's attorney indicated that defendants might not only be protected under the terms of the Workmen's Compensation Act but also by insurance, such as the Dinwiddie Construction Company had, by the policy issued by the Pacific Indemnity Company.

Defendants' attorney had argued that the Dinwiddie Construction Company had to indemnify itself either by such insurance as herein shown or by putting itself under the Workmen's Compensation Act. This statement by defendants' attorney together with similar argument to the effect that only those who rejected the Workmen's Compensation Act could procure insurance such as that which the Dinwiddie Construction Company had doubtless led the attorney for plaintiff into the course to which objection was made by defendants and upon which alleged error is now predicated.

It is well settled that in a case of this character a wilful intimation or charge by plaintiff that defendants are protected by indemnity insurance is ground upon which the trial court should declare a mistrial; but where the defendants' improper statements provoke the objectionable statements by plaintiff the error will not be held to be reversibly prejudicial. Moreover, the trial court is in much better position than an appellate court to determine from the tone and manner of the attorney whether the statement was wilful and intentionally improper. In this case the objection was presented to the trial court upon a motion for a new trial which motion was overruled.

We think too that the subject of indemnity insurance so permeated the record of this case, independently of the argument thereon of plaintiff's attorney, that the jury was not prejudicially influenced by the argument thereon of plaintiff's attorney.

■■ Defendants urge that the provisions of the Employers' Liability Act are not applicable to this case, because plaintiff was not an employee of defendants or either of them. In an opinion by Judge McCamant, a former member of this court, the United States Court of Appeals for the Ninth Circuit say:

"Every employer whose work involves risk or danger is required by the statute to take the required precautions, not only for the protection of his own employees, but also for the protection of employees of others whose duties bring them within reach of the dangers and risks of such work. The Supreme Court of Oregon has so construed the statute, and this construction is binding on the federal courts. Clayton v. Enterprise Electric Co., 82 Or. 149, 161 P. 411; Cauldwell v. Bingham & Shelly Co., 84 Or. 257, 155 P. 190, 163 P. 827; Rorvik v. North Pacific Lumber Co., 99 Or. 58, 70, 190 P. 331, 195 P. 163." *Pacific States Lumber Co. v. Bargar,* 10 F. (2d) 335.

The federal case above cited is mentioned, and the principle quoted therefrom is applied in *Walters et al. v. Dock Commission,* 126 Or. 487 (266 P. 634, 270 P. 778). Such construction of the Employers' Liability Act has become the settled law of this jurisdiction.

■ Defendants insist that there is no evidence of any common law negligence. We think that the testimony, which discloses that the operator of the truck failed to warn plaintiff and hoisted the tank containing the concrete mixture instead of moving the truck forward as directed, reflects a failure on the part of the truck operator to exercise ordinary care, and that his negli-

gence would be imputed to his employer. The testimony in behalf of plaintiff, that the links of the safety chain were badly worn; that the chain had the appearance of having been taken from a junk pile, and that its links were broken apart at the time of plaintiff's injury, tends to disclose a failure on the part of the owners and operators of the truck to use reasonable care in inspecting the truck to ascertain whether it was reasonably safe for the use demanded of it.

We are not unmindful that this testimony, both as to the directions to the driver to move forward and as to the condition of the chain, was contradicted by witnesses for defendants, but that simply presented issues of fact for the jury.

■ Defendant, Readymix Concrete Company, contends that there is no evidence tending to show that it had any control over the truck driver. The name, Readymix Concrete Company, appeared on the sides of the truck. This was explained by one of the witnesses as being merely for the purpose of advertising, but we think that the credence to be given to that explanation was for the jury. The jury could have disbelieved it and drawn the conclusion that the Readymix Concrete Company either wholly or partly had control of the truck. Moreover, it is undisputed that the character of the concrete mixture, whether dry or wet, was controlled by the Readymix Concrete Company. The testimony of the gentleman, who was president of both defendant companies, is susceptible of the construction that, after the accident in suit, both defendants realized that the mixture transported, when plaintiff was injured, was too dry to be emptied into the pier holes by the device with which the truck was equipped, or, in other words, that some other device or machine should have been used.

594

The disclaimer of liability for injury to shrubbery, flowers, roadway or private property in delivering said concrete mixture is susceptible of the construction that the Readymix Concrete Company had control of such delivery.

For these reasons, we hold that there is testimony in the record justifying the submission of the case to the jury as to defendant, Readymix Concrete Company.

■ Exception is urged to the action of the trial court in submitting the question to the jury as to whether plaintiff should recover special damages for medical expenses. Defendants assert that these expenses had already been paid by the indemnity company; and, hence, plaintiff could not recover them. The learned trial judge was careful to instruct the jury that payments made under the agreement not to sue should be deducted from the damages otherwise accruing to plaintiff. This obviated the question of a double recovery by plaintiff.

■ Error is assigned because the trial court instructed the jury that consideration could be given to plaintiff's life expectancy of 23.8 years It is argued that, by this instruction, the court withheld from the jury the effect of arthritis with which plaintiff suffered before the accident in suit and that because of an alleged inconsistency in the testimony as to plaintiff's age the period mentioned could not be unqualifiedly considered as plaintiff's life expectancy. As to the discrepancy in the testimony concerning plaintiff's age, one of the physicians testified that he had on his notes, from which he testified, a record that plaintiff was 50 years of age. Plaintiff and plaintiff's mother fixed his age at 46 years. The period named applies to one whose age is 46.

We quote the instructions:

"You may take into consideration the testimony as given on the witness stand to assist you in determining the present value of what McKay would reasonably be expected to earn by considering the life expectancy of plaintiff, what he earned prior to his injury, and computation of this amount based upon his life expectancy and his earnings prior to the injury, and in this matter you are privileged to consider what the plaintiff would lose, if you concluded that he will lose his yearly earnings in the future, and what he would be damaged because of his impaired earning capacity. In other words, from the preponderance of the evidence, if you conclude that plaintiff is entitled to damages due to impaired earning capacity, it is proper to consider plaintiff's expectancy of life and the present value of a yearly income equivalent to the probable reduction of plaintiff's earnings. Plaintiff's earning capacity for this purpose is to be considered as it was before the injury complained of. However, you are not entitled to make the award entirely as a matter of mathematical calculation from mortality and interest tables without considering other circumstances in the case, such, for example, as a probable dimunition of plaintiff's earning capacity with advancing years.

"In other words, if you conclude that the plaintiff is entitled to damages, then you may consider compensation for the loss of time resulting from personal injury and measure it by the amount of money which the plaintiff might reasonably have earned in the same time by the pursuit of his ordinary occupation, subject to the instructions I have heretofore given you."

We think the consideration to be given, under the instructions of the court, to the period named as plaintiff's life expectancy was subject to other circumstances in the case and that probable dimunition of plaintiff's earning capacity with advancing years sufficiently advised the jury that plaintiff's physical condition, be-

fore the accident, and its probable effect upon his future earning capacity, were matters also to be considered in assessing plaintiff's damages. The testimony so clearly proves that at the time of the accident plaintiff was 46 years of age, that the jury could not have been misled in that respect.

■ Finally, it is urged that excessive damages were awarded because of passion and prejudice. The damages were assessed at $34,538. It is urged that the principal injury plaintiff suffered was a fractured leg. Two physicians testified that plaintiff was suffering from a lesion of the heart. One of them testified that in his opinion the accident was a distinct factor in producing the heart symptoms that plaintiff showed after the accident. One of them also testified that there were small calli in the region of the seventh and eighth ribs, which were probably the result of recent fractures. From the testimony for plaintiff, it appeared that plaintiff's injuries were permanent that he could never again engage in manual labor. Plaintiff was confined to the hospital for four months and eight days. The order of substitution discloses that he died on February 4, 1937.

We cannot say that there is evidence of passion or prejudice in the action of the jury. We realize that the judgment is large; but, if plaintiff's witnesses are to be believed, plaintiff's injuries and suffering were extremely and pathetically severe.

The judgment of the circuit court is affirmed.

BELT, J., did not participate in this decision.