Argued June 2, affirmed December 23, 1970, petition for
rehearing denied February 9, 1971

## KUHNS, *Respondent, v.* STANDARD OIL COMPANY OF CALIFORNIA, WESTERN OPERATIONS ET AL, *Appellants.*

478 P2d 396

*Leo Levenson*, Portland, argued the cause for appellant Standard Oil. With him on the briefs were Mize, Kriesien, Fewless & Cheney, Portland. *Duane Vergeer*, Portland, argued the cause for appellant Ringsby Truck Lines. On the briefs were Walter H. Sweek and Vergeer, Samuels, Roehr & Sweek, Portland.

*Frank H. Hilton, Jr.*, Portland, and *Dwight Schwab*, Portland, argued the cause for respondent. With them on the brief were Hutchinson, Schwab & Burdick, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, SLOAN\*, HOLMAN, TONGUE, HOWELL and SCHWAB, Justices.

HOWELL, J.

Plaintiff, a truck driver employed by Converse Trucking Lines, drove his truck to a gas and oil pump preparatory to putting oil in the engine. He stepped backward out of the truck onto a concrete island where the pumps were located, slipped in a puddle

---

\* Sloan, J., resigned September 30, 1970.

of oil that had leaked out of the oil dispenser, hit his back on the edge of the island, and was severely injured.

Plaintiff filed this action against Standard Oil Company; Ringsby Truck Lines, Inc.; C. M. Emeis & Company; Don Avery dba Avery Plumbing and Heating Company; Lincoln Engineering Company of California; and Shields, Harper & Company. An involuntary nonsuit was granted in favor of Lincoln Engineering Company and Shields, Harper & Company. A jury rendered a verdict in favor of plaintiff and against Standard Oil Company and Ringsby Truck Lines, Inc., and in favor of the defendants C. M. Emeis & Company and Don Avery dba Avery Plumbing and Heating Company.

Standard Oil Company and Ringsby Truck Lines, Inc., have filed separate appeals from the judgments entered against them. Each assigns as error the denial of a motion for a judgment of involuntary nonsuit and a motion for a directed verdict.

## LIABILITY OF STANDARD OIL COMPANY

We shall first consider Standard's appeal. In his amended complaint the plaintiff alleged that he was an employee of Converse Trucking Service, a corporation engaged in interstate trucking and hauling, and that his employment required him to work at a truck terminal operated by defendant Ringsby Truck Lines, Inc. Prior to May 29, 1963 (the date of plaintiff's injury), a gas and oil dispensing and storage facility was constructed at the terminal by Standard under a contract between Standard and Ringsby. Ringsby also agreed to purchase gas and oil products from Standard. Standard contracted with defendant Emeis to

construct the facility, and Emeis in turn contracted with defendant Avery for installation of the pipes, fittings, hoses and plumbing to be used in the gas and oil dispensing facilities at the terminal.

In deciding whether the trial court erred in denying Standard's motion for a nonsuit and a directed verdict, we are, of course, required to interpret the evidence in the light most favorable to plaintiff.

In February and March, 1963, other construction work not directly related to the construction of the gas and oil dispensing facility was being conducted. The terminal began operating in April, 1963, but at that time the air compressor which powered the pump had not been hooked up to the oil in the tank, and the tank had water in it. The water was pumped out. Standard put oil in the tank, and the tank was in use by May 1, 1963. As soon as the oil was placed in the tank and the pump hooked up, the oil started to leak from a brass valve where the oil hose connected with a metal pipe. The shop superintendent reported the oil leak several times to the terminal manager, Sayres, and to the sales representative for Standard Oil, who said he would see that it was taken care of. The terminal manager also reported the oil leak to Standard's sales representative and called it to the attention of Standard's engineering department. He testified that he advised the sales representative that if the oil leak was not cleaned up, somebody would get hurt. The terminal manager assigned a mechanic to the job of cleaning up the puddle of oil. The mechanic generally mopped up the puddle each morning, but failed to do so on the morning of May 29, 1963, and plaintiff slipped in the oil and was injured. John Duff, an associate engineer for Standard, checked the oil leak two days after plaintiff's accident

and called Emeis to take care of the problem. The leak was repaired approximately a week after plaintiff's accident by replacing an elbow or brass fitting on top of the pipe.

The president of Ringsby Truck Lines testified that he personally selected Standard to install the oil and gas facility because "they do good work at a reasonable cost," and it was Standard's responsibility to see that the contract was carried out. Duff, Standard's engineer, testified that it was his job to check over the plans for proposed facilities, put the jobs out for bid, select the low bidder and write the contracts. The defendant Emeis was selected by Standard as the prime contractor. Emeis testified that he excavated for the fuel tanks and set the tanks. The plumbing and piping from the tanks to the dispensing facility, including the piping where the leaks occurred, were installed by the defendant Avery as the subcontractor under Emeis. Duff, the engineer, testified that during the construction of a facility he made periodic checks to see that the work was done according to Standard's requirements. Duff also stated it was his job to work with the contractors, see that the job was done according to the plans and specifications, "to get these people back on the job * * * if you have malfunctions after the job is complete," and in general to see that the "job was done right." Duff followed the same procedure for this job and was there personally from time to time. Emeis testified that Standard usually checks after the equipment is installed to see that there are no leaks and that the equipment is operating properly. He could not recall if Standard checked this particular installation or not. Duff could not recall whether or not he had been out to the job after its completion. He also

stated that he knew of swivel joints in other installations that had leaked. The installation was completed in January 1963, except for some painting.

Plaintiff alleged that Standard was negligent in failing to test or inspect the oil dispensing equipment for leaks, and in failing to repair the equipment to stop the leak. Standard contends that the plaintiff failed to prove that Standard contracted to build and install the dispensing equipment and failed to prove that Standard owed any duty to the plaintiff to test, inspect or repair the equipment. Rather, Standard contends that it "was simply a conduit of the product from the manufacturer to Ringsby" and had no duty to test or inspect for defects or to repair any defects.

■ Clearly there was sufficient evidence for the jury to find that Standard was more than a mere "conduit" between the manufacturer and Ringsby, and that Standard contracted to construct the facility. Standard drew the plans, ordered materials, placed the job out for bid, selected Emeis as the prime contractor, and made regular inspections to insure the construction was being done in accordance with the contract. The evidence was sufficient to show that Standard was the general contractor.

■■ When Standard engaged Emeis to construct the facility, Emeis stood in the relation of independent contractor to its employer, Standard. *Macomber v. Cox*, 249 Or 61, 435 P2d 462 (1968). Thus the primary issue is whether Standard as the employer of Emeis owed plaintiff, an employee of Converse Trucking Lines, a duty to test, inspect and repair the pipe fittings.

The cases of *Strandholm v. General Const. Co.*, 235 Or 145, 382 P2d 843 (1963), and *American Insurers v.*

*Bessonette*, 235 Or 507, 384 P2d 223, 385 P2d 759 (1963), cited by plaintiff, are not applicable because in each of those cases liability was predicated upon the contractor's own negligent conduct in the actual construction of the facility. In the instant case the liability of Standard cannot be based upon any error or omission of Standard in the actual construction because the construction was accomplished by Emeis, the independent contractor, and Avery, the subcontractor for Emeis.

The jury, by its verdict in favor of Emeis and Avery, in effect found that they were not negligent in the construction of the gas and oil dispensing facility. In this respect the instant case is different from *Macomber v. Cox, supra.* There, a general contractor who had been engaged to construct a service station employed a subcontractor to do the electrical work. The plaintiff, injured when a light fixture fell from the ceiling of the service station, sued the general contractor, the subcontractor, and the owner. The jury returned a verdict against the general contractor and the subcontractor.

This court reversed the judgment against the general contractor who employed the subcontractor to install the light fixture and followed the general rule that the employer of an independent contractor is not subject to liability for bodily harm caused to another by the tortious act or omission of the contractor or his servants. In doing so, however, this court recognized the great many exceptions to the rule. 249 Or at 65.

■ However, apart from the question of vicarious responsibility on the part of an employer of an independent contractor, the employer may be liable for any negligence of his own in connection with the work to be performed. Where the employer gives directions

for the work, or retains control over it, he is required to exercise reasonable care for the protection of others, including making a reasonable inspection of the work after it is completed, to be sure that it is safe. In such cases the employer is liable for his own personal negligence, rather than that of the contractor. Prosser, Torts 481-82 (3d ed 1964). See also 2 Harper & James, The Law of Torts 1405, § 26.11.

■ Standard argues that the jury verdict in favor of the subcontractors exonerates it also from liability to plaintiff, citing *Eckleberry v. Kaiser Foundation et al*, 226 Or 616, 359 P2d 1090, 84 ALR2d 1327 (1961), and *Kraft v. Montgomery Ward & Co., Inc.*, 220 Or 230, 315 P2d 558, 348 P2d 239, 92 ALR2d 1 (1960). These cases cite the general rule that where the master and servant are sued jointly in an action based solely on the tortious conduct of the servant and the servant is acquitted, there can be no recovery against the master. However, both cases recognized exceptions to the rule where there are separate grounds on which to find the master liable. In the instant case the failure to test, inspect or repair the facility was separate grounds on which the jury could, and did, find Standard liable.

Defendant cites the case *Tropea v. Shell Oil Company*, 307 F2d 757 (1962), to support its argument that it had no duty to repair the oil leak. There, Shell Oil Company, as the lessor of a service station, engaged an independent contractor to repair a fuel pump. In doing so, the employee of the independent contractor withdrew gasoline mixed with water from one of the fuel tanks, the mixture caught fire, and plaintiff was injured. The court held that Shell, as the employer of an independent contractor, was not liable for injuries sustained by a third party because the work involved

was not inherently dangerous. However, there was no evidence in that case of the injury being caused by defective equipment nor that Shell, as the employer, actively participated in the construction, including inspecting and testing the equipment as in the instant case.

Standard argues that it had no duty to repair because "subsequent to the installation of the facilities the duties of maintenance and repair are upon Ringsby," under the terms of a contract between Standard and Ringsby which was introduced into evidence. The contract, on a printed form, provided that Standard would sell Chevron gas and diesel fuel to Ringsby. It also provided that Standard agreed to sell and Ringsby agreed to purchase the storage facilities at the terminal; that Standard agreed to secure the services of an independent contractor to construct the facilities; and that Ringsby, as the buyer, agreed to maintain the storage facilities in good condition and repair. However, there was substantial evidence that Standard and Ringsby did not operate under this contract. The contract was dated March 1, 1963, and the construction of the facility, with the exception of hooking up the compressor to the tank and filling the tank with oil by Standard, had been completed by the previous January, and Ringsby had accepted it and paid for it. Duff, Standard's engineer in charge of the project, testified that he had prepared the contracts for Standard but that he was not familiar with the form of the contract dated March 1, 1963. Clearly the jury was entitled to find that the rights and obligations of Standard and Ringsby arose out of the original contract for the construction of the facility and not from the March 1 memorandum.

Standard argues that inspection of the work during construction does not render it liable on the theory of respondeat superior, citing *Kirk v. United States*, 161 F Supp 722 (D Idaho SD 1958) *aff'd* 270 F2d 110 (9th Cir 1959). However, Standard's liability was not derivative but was based on its own independent negligence in failing to test or inspect the oiling equipment to determine if it was functioning properly after the subcontractors had completed their work and the equipment was operational.

■ Standard also argued in its motion for a directed verdict that the negligence of Ringsby, the terminal operator, in permitting the oil to accumulate on the surface of the facility was an intervening and superseding cause of plaintiff's injuries.

In support of this argument Standard contends that any acts of negligence in failing to inspect, to test or to repair were not substantial factors in physically producing plaintiff's injuries and that plaintiff's injuries could not have been foreseeable by Standard because Standard had a right to assume that plaintiff's employer would provide plaintiff with a safe place to work.

In *Stout v. Madden & Williams*, 208 Or 294, 300 P2d 461 (1946), this court held that the act of a purchaser in driving a used car with defective brakes was an intervening unforeseeable act of negligence which was the efficient cause of an accident and thus insulated the seller from his liability for selling a known defective car.

Since the decision in *Stout v. Madden*, this court decided the case of *Dewey v. A. F. Klaveness & Co.*, 233 Or 515, 379 P2d 560 (1963), in which this court

stated the following regarding the foreseeability test in determining negligence and proximate cause:

> "The question for the jury under the foreseeability test is whether a reasonable person in the position of the defendant would have foreseen that his conduct would probably have created the risk which plaintiff encountered and which caused his injury." 233 Or at 528, concurring opinion of Mr. Justice O'CONNELL.

In *Hills v. McGillvrey*, 240 Or 476, 402 P2d 722 (1965), the seller of an improper wheel bearing contended that its act of negligence was insulated by the negligence of a mechanic in installing the wheel bearing. This court held that it was a question for the jury to decide if the conduct of the seller was a substantial factor in producing the harm. The court stated:

> "It was for the jury to decide whether or not harm to the public might be a foreseeable result of the conduct of Orchard Auto Parts. If it was reasonably foreseeable that some harm to the traveling public could result from the installation of the wrong part on an automobile, and if it was reasonably foreseeable that the mechanic might negligently install on an automobile a part supplied him for such a purpose, then it would follow that there was a duty on the part of the suppliers not to supply the mechanic the wrong part." 240 Or at 482.

It would have been error for the trial court to have ruled as a matter of law that Standard's acts of negligence in failing to test, to inspect or to repair the facility were not substantial factors in producing plaintiff's injuries. The jury was entitled to infer that an inspection would have disclosed the leaking oil and that if the leak had been repaired, plaintiff would not have been injured. It was also a question for the jury

to decide if the accident was foreseeable by Standard. The evidence disclosed that the leak caused a puddle of oil which was very slippery. The jury could conclude that it would have been foreseeable by Standard that the oil from the leak would not have been mopped up and that an injury could result.

The acts of negligence of Standard in failing to test, inspect and repair the facility are entirely separate from the negligence of Ringsby in failing to mop up the oil on the morning of plaintiff's accident. If both Standard and Ringsby were negligent and their combined negligence produced the result, then the negligence of Ringsby will not insulate Standard. *Hills v. McGillvrey, supra* at 483. To the extent that *Stout v. Madden, supra,* is inconsistent with this decision, it is overruled.

■ As an alternative to its motion for judgment n.o.v., Standard also moved for a new trial and assigns as error the giving of the following instruction:

"Now, plaintiff further goes on, and as far as the defendant Standard Oil Corporation is concerned, a California corporation; no issue there. But he says that the defendant Standard Oil Company of California and the defendant Ringsby Truck Lines entered into an agreement that the defendant Standard Oil Company agreed to build and install all gasoline, oil dispensing storage facilities to be used in connection with said truck terminal; that the defendant Ringsby Truck Lines agreed to purchase its gasoline and oil products from defendant Standard Oil Company under the agreement.

"You'll have the contract with you. There's no question there was an agreement between the parties as to the purchase by Ringsby of Standard Oil products. As to the rest, the contract, you heard arguments thereon as to whether or not they

were to install all gasoline and oil dispensing equipment, storage facilities to be used and I'll submit that matter to you.

"Standard Oil claims, of course, that they did it as a part of their agreement with Ringsby, and as I recall, an accommodation and at their request. And there's no question but that was done, so I leave you to determine the effects of the contract and the construction of it."

The court was referring to the contract previously mentioned between Standard and Ringsby dated March 1, 1963. Standard contended that the contract required Ringsby to maintain and repair the equipment after it had been installed. As we have stated, there was a serious question as to whether the contract had any efficacy because it was dated after Standard had completed all work except hooking up the oil tank to the compressor and after Standard had been paid. There was also evidence that Standard did not construct the facility pursuant to the contract because Standard's engineer testified that he was not familiar with the contract. It could also be argued that the contract was merely for the purchase and sale of Chevron products. The trial court was attempting to explain the position of the parties in regard to the contract. While the language used by the court may be subject to criticism, giving the instruction did not constitute reversible error.

■ Standard contends that the court erred in instructing the jury that it "will have to determine from all the evidence and circumstances in this case whether there was a duty owing to the plaintiff from any one or all of the defendants as alleged in plaintiff's complaint. * * * If there was a duty owing by any one or all of the defendants on any one or more of the

allegations of negligence alleged by the plaintiff then it becomes your duty * * * to determine if there was a breach of that duty * * *."

Standard excepted to the court's "submitting to the jury the determination of the duty owing by Standard Oil Company to plaintiff on the grounds * * * that it is a matter of law for the court's determination and not a matter of fact for the jury's determination." Standard excepted on the further grounds of a superseding negligence and that there was a failure of proof of any duty to test, inspect or repair.

The court instructed the jury regarding plaintiff's allegations of negligence against Standard and that plaintiff had the burden of proving those charges; that the jury could consider only those charges of negligence alleged in plaintiff's complaint and no others.

The trial courts should instruct the jury regarding the legal duties imposed upon the parties. However, the instruction used by the court in this case, while it failed to delineate the duties imposed upon Standard, did not prejudice Standard and was not reversible error. Throughout the trial and in the appeal to this court, Standard has contended that it did not enter into a contract to construct the facility for Ringsby, and that it had absolutely no duty to test, inspect or repair. Despite Standard's denial that it had an obligation to inspect or test the facility, the testimony of Standard's engineer and Emeis shows that inspecting and testing were Standard's obligation. The evidence was undisputed that Standard did not inspect, test or repair the facility. Under these circumstances, Standard cannot complain of the court's

failure to instruct that it had the duty to test, inspect and repair. This assignment is without merit.

■ Standard assigns as error the court's allowance of a motion to strike an allegation in Standard's second and further separate answer and defense that plaintiff had entered into a compensation and trust agreement and covenant not to sue with his employer, Converse, and that plaintiff's damages should be reduced by the amount plaintiff has received under the agreement. The motion to strike was allowed by a different judge than the trial judge in this case. However, at the trial the court ruled that the question of whether the compensation agreement operated as a pro tanto reduction of any amount plaintiff should recover was a matter for the court and not the jury to decide. Subsequent to the trial, the court entered findings of fact and conclusions of law to the effect that payments made pursuant to the agreement were not absolute payments but were loans for which the defendants were not entitled credit.

The agreement, entitled "Compensation and Trust Agreement and Covenant Not to Sue," provides that the plaintiff's employer, Converse, will pay plaintiff a monthly sum for his disability at rates under the Workmen's Compensation Law. The employee agrees to make no further claims against the employer and will not maintain any suit or action against the employer. Paragraph 6 of the agreement states:

> "Employee agrees to take such action as may be necessary or appropriate to recover damages suffered on account of said injury from any party, other than employer, who may be legally liable therefor, and further agrees to make no settlement without consent of the employer. Employee agrees to hold any money recovered from or on

behalf of such party as a result of judgment or as a result of settlement with or without litigation, in trust for employer, to be paid to employer immediately upon recovery thereof, to the extent of any amount paid or to be paid under this agreement. Any sum recovered in excess of these amounts shall be retained by employee."

The agreement is similar to the loan receipts which have been approved by this court in *Waterway Terminals v. P. S. Lord*, 242 Or 1, 406 P2d 556 (1965), and in *Furrer v. Yew Creek Logging Co.*, 206 Or 382, 292 P2d 499 (1956). While the instruments in those cases referred to the payment by the insurer as "loans," the agreements like the one in the instant case required the injured party to pursue any remedy he may have against the tort-feasor and to repay the amount received. The sums received by plaintiff were not absolute payments, and plaintiff is obligated to repay Converse from the judgment recovered against Standard and Ringsby.

*McKay v. Pacific Bldg. Materials Co.* involved facts similar to the instant case. (156 Or 578, 68 P2d 127 (1937).) There, the plaintiff accepted benefits similar to Workmen's Compensation from the employer's insurer. He executed a document entitled "Covenant Not To Sue and Agreement" which required him to repay the insurer from any recovery against the tort-feasor. The trial court treated the payment received as a pro tanto discharge of the defendant. This court said:

"As stated, the trial court gave it the effect of a pro tanto discharge. If there had been no requirement on plaintiff's part to reimburse the indemnity company, such a ruling would conform to the weight of authority. The agreement does not evidence an election of remedies as to the defendants

herein, nor a release of joint tort-feasors." (156 Or at 590).

■ Standard also argues that the compensation agreement constitutes an assignment of a claim for personal injuries and as such is against public policy. It is sufficient to say the decisions cited by Standard did not involve agreements similar to the compensation agreement herein and are not applicable. The title to plaintiff's cause of action against other tort-feasors remained in plaintiff and did not pass to his employer under the agreement.

We conclude that Standard is not entitled to a pro tanto reduction of the judgment for the amounts plaintiff has received under the compensation agreement with Converse.

The plaintiff's judgment against Standard is affirmed.

## LIABILITY OF RINGSBY TRUCK LINES, INC.

■ Plaintiff alleged in his complaint that the defendant Ringsby was the operator of the truck terminal and was negligent in failing to repair the oil leak, warn plaintiff of the danger, and clean up the oil. Ringsby contended in its motion for a nonsuit and for a directed verdict that there was no evidence that it operated the truck terminal, or that the terminal was operated by Ringsby through Converse as its agent; therefore it violated no duty owed to plaintiff.

Counsel for Ringsby states in its brief that "Ringsby's position in the case is very complicated." We agree, and the following facts are set out not only to determine whether Ringsby was in control of the

terminal as plaintiff contends, but also to illustrate the confusion regarding which corporation, Ringsby or Converse, was the employer of the men working at the terminal. The facts are also important in relation to the "Covenant Not to Sue and Trust Agreement" executed by plaintiff in favor of Converse and which will be discussed later.

Ringsby is a Nebraska corporation engaged in interstate trucking throughout the midwest, with its principal office in Denver, Colorado. Ringsby owns a great many terminals in various areas and owns or controls several subsidiary corporations.

On September 28, 1961, Ringsby agreed to purchase all of the capital stock of Converse Trucking Service, subject to the approval of the ICC. Because Converse was in a precarious financial condition, it was agreed that Ringsby would apply to the ICC for temporary control and management of Converse pending the approval of the purchase by the ICC. Temporary authority was granted by the ICC in 1961 and was continued periodically until July 1964. Crawford, the president of Ringsby, became vice-president of Converse in 1961. Other Ringsby officers became president, secretary-treasurer, and assistant secretary of Converse. Crawford testified, "When we received the temporary authority from the Interstate ICC, we moved into helpful management of Converse Trucking Service." At that time Converse was "losing $10,000 a month, every month, just as regular as a clock," and its credit was not good. Crawford stated that when Ringsby took over management of Converse under the authority granted by the ICC:

"* * * through my direction I immediately made an audit of payroll to determine job positions,

duties and responsibilities. I recommended to Mr. Converse and the staff that we install certain policy procedures concerning most everything in operations, from dispatch controls to expense accounts.

"And I made recommendations concerning the type of traffic they were handling, suggesting that we move into the field of generally less than truckload traffic and in preference to the truckload operation, that they were handling in the past, and hundreds of other competent moves that were, of course, agreed upon by the people and through policy directions were accomplished, including time departures and schedules, pickup, delivery, performance ratings and billings, tariff controls, sales policies, maintenance, controls, facility improvements."

Crawford stated that in a matter of months Ringsby had Converse operating in the black.

Crawford also stated that Ray Converse, who owned all the stock of Converse, continued to be as active as he could, but that he had serious health problems, was living in Berkeley, California, and received a salary of $1500 per month.

According to Ringsby, Ray Converse continued to own all the stock of Converse during 1962 and 1963; Ringsby has never operated in Oregon, has never directly participated in the management of the Portland truck terminal, and could not have purchased Converse without the approval of the ICC.

However, the record discloses the following: Ray Converse tendered his resignation as president of Converse in December, 1961; on April 29, 1963 (one month before plaintiff's accident) a plan of complete liquidation of Converse was promulgated by Crawford as vice-president of Ringsby, and the plan

states that Ringsby holds 100 per cent of the stock of Converse; Ringsby, as the owner of 100 per cent of the stock of Converse, assumed the tax liability of Converse; the financial report of Converse states that the date of the closing of the purchase by Ringsby was February 1, 1963; the accountant's report of Ringsby states the same.

On the other hand, Ringsby did not eventually purchase Converse. J. W. Ringsby, chairman of the Board of Directors of Ringsby, testified that in 1964 Ringsby either "withdrew" from the purchase or "substituted" Fortier Transportation Company of California as the purchaser, he was "not sure which." Fortier immediately changed its name to Ringsby Pacific Limited, and two sons of J. W. Ringsby became president and vice-president of Ringsby Pacific. Ringsby Pacific also used the name of Ringsby System, although it is an entirely separate corporation.

Ringsby and Standard entered into an agreement whereby Ringsby was to buy Chevron gas and diesel fuel from Standard. Crawford personally selected Standard to construct the gas and oil facility at the truck terminal. The construction of the facility was the responsibility of Standard, but Crawford personally observed the construction and participated in decisions concerning it. Crawford also stated that Sayres was the terminal manager and as such had jurisdiction over the operation of the gas and oil pumps, plus general responsibility for "the conduct of good service and he has complete control of the people that work for the terminal—pick-up [and] delivery drivers, dock people, office people; he is responsible for the profitable conduct of the terminal, terminal operations."

Sayres testified that he had been a terminal manager for Converse from 1946 until 1962 and that he worked for Ringsby as terminal manager from 1962 until June 1963. He also stated that all of his instructions came from Oakland and Denver after January 1963, and that he received various instructions and directions from the Ringsby terminal manager at Oakland during 1962 and 1963.

Sayres testified that they were not able to use the oil in the tank until a compressor arrived from the Ringsby plant at Oakland and was hooked up, so that the compressor could feed the oil from the underground drum to the supply line. The leak was noticeable as soon as they started using the oil dispensing facility and the leak came, not from the nozzle, but from the fitting to the supply line which connected the hose. While the leak was a slow leak, it did not take too long to make a puddle. The leak was first called to Sayres' attention by the mechanics and the truck drivers. He notified Standard Oil. In the meantime he directed the shop foreman to have the mechanic on duty clean up the oil, and he told the shop foreman, "We better clean up every day before somebody [gets] hurt." Sayres stated that the film of oil was so thin that it was not easy to see, but that if you stepped on it, it was very slick. He also stated that no warning was given to any of the employees at the terminal about an oil leak "because the shop started cleaning it up and there wasn't too much of a chance of anyone getting in there unless they got out there before the mechanics [came] and that was not very often." On the morning of plaintiff's accident, the mechanic failed to mop up the oil and plaintiff was injured.

Ringsby argues that the only evidence that it operated the terminal was the testimony of Sayres, the

terminal manager at the time of plaintiff's accident, that he was a Ringsby employee at that time. While Sayres testified that he was paid by checks drawn on Converse, his instructions came from Ringsby department heads and from the Ringsby district manager in Oakland, California. The evidence viewed as a whole shows that Ringsby immediately made changes in the operation of the terminal, including pickup and delivery, maintenance, controls, facility improvements, plus selecting and contracting with Standard for the construction of the facility. Such evidence was clearly sufficient to support a finding that Ringsby was in direct control. The trial court properly denied Ringsby's motion for a nonsuit and a directed verdict.

Ringsby assigns as error an instruction by the court that "[t]here's no question there was an agreement between the parties as to the purchase by Ringsby of Standard Oil Products."

Ringsby contends that the instruction was in error because there was evidence from which the jury could find the contract was between Standard and Ringsby as the agent of Converse. The instruction was preliminary and was given when the court was explaining the contentions of the parties. The court was referring to the written contract between Ringsby and Standard whereby Ringsby agreed to purchase Chevron gasoline and diesel fuel from Standard after Standard had completed construction of the facility. The contract was signed by Standard and Ringsby, and was introduced in evidence. The court merely stated a fact. This assignment is without merit.

Ringsby assigns as error an instruction by the court as follows:

"You are further instructed from the evidence

in this case that Mr. Kuhns' employer had actual notice of the hazard existing by reason of the oil on the island and had the duty of warning, as a matter of law, Mr. Kuhns of such hazard as would not be apparent to him in the exercise of reasonable care, *whoever that employer may be*." (Emphasis added.)

The court in another instruction told the jury that plaintiff alleged in his complaint that he was an employee of Converse. The plaintiff testified that he was an employee of Converse. Viewing the instructions as a whole we do not believe that the court committed reversible error.

■ Ringsby also complains of the failure of the court to give the following instruction:

"Insofar as the liability of Ringsby Truck Lines, Inc., if any, is concerned, you are instructed that it is not sufficient if plaintiff proves that Ringsby Truck Lines, Inc. through its officers exercise general managerial powers. The plaintiff must prove in addition that Ringsby Truck Lines controlled the details involved in the operation in which plaintiff was injured."

Ringsby argues: "Clearly Ringsby was entitled to have the jury instructed that evidence of a remote general managership would not be sufficient. * * * The control necessary for liability must be control and *right to control* in detail." (Emphasis added.)

The court did not err in failing to give the instruction. The requested instruction did not include "right to control." In addition, the requested instruction was vague as to the meaning of "the details involved in the operation." Crawford testified that Sayres, the terminal manager, was responsible for the profitable operation of the terminal and had com-

plete control of the people that work for the terminal, including drivers, dock people, and office people. If additional details were involved, Ringsby should have pointed them out in the instruction. This assignment is without merit.

■ Ringsby also charges error by the trial court in making the following statement in regard to damages:

"The items of general damage which *you are to consider* in the present case are these: First, such sum ° ° °" (instruction then lists several elements). (Emphasis added.)

This assignment is patently without merit. The instruction followed the wording of Instruction No. 30.02 of the Oregon State Bar Uniform Jury Instructions. It cannot be construed as being mandatory as Ringsby contends, because the court gave the usual instructions on the burden of proving damages and that the court's instructions on damages were no indication to the jury that damages should be awarded.

■ Ringsby assigns as error the refusal of the trial court to submit the compensation agreement and covenant not to sue to the jury. Ringsby contends that the compensation agreement was relevant on the issue of whether Ringsby was entitled to a pro tanto reduction of any recovery. However, prior to the start of the trial, counsel and the court discussed the possible effect of the agreement and, if defendants were entitled to a pro tanto reduction, whether such reduction should be made by the jury or by the court. The court stated that it believed the effect of the agreement created a legal issue which should be determined separately. Counsel for Ringsby then stipulated as follows:

"MR. VERGEER: That's the right procedure and the record should show that I'll stipulate to

hearing this after the trial, and that would be satisfactory."

Subsequent to the trial the court entered findings of fact and conclusions of law relating to the agreement. Ringsby cannot complain of this procedure in view of the stipulation.

15. Ringsby makes the further contention that the compensation agreement should have been submitted to the jury because it was relevant on the question of whether Sayres was employed by Ringsby or by Converse. The compensation agreement was executed on June 27, 1963. The agreement was signed by plaintiff as the employee and contains the name "Converse Trucking by Bill Sayres" as the employer. Ringsby contends that the agreement supports its position that Sayres was employed by Converse and not by Ringsby.

However, it was not until all the parties had rested their cases that Ringsby moved to have the compensation agreement considered by the jury on the question of Sayres' employment. Counsel for Ringsby had agreed previously that the compensation agreement could be considered by the court in a supplemental hearing. It was within the trial court's discretion as to whether the case should be reopened and the exhibit received. We cannot say it was a manifest abuse of discretion by the court to refuse to reopen the case. *Arbogast v. Pilot Rock Lbr. Co.*, 215 Or 579, 336 P2d 329 (1959).

Ringsby finally contends that the trial court erred in making the following findings of fact and conclusions of law:

"Findings of Fact

II

"The defendant Ringsby Truck Lines, Inc. was

directly operating the truck terminal at N.W. 26th Avenue and Yeon Street, Portland, Oregon, where the plaintiff was injured and is liable to the plaintiff for the negligent operation of said terminal apart from any *respondeat superior* liability for the conduct of Converse Trucking Service."

"Conclusions of Law

I

"Execution by plaintiff of the covenant did not release the defendant Ringsby Truck Lines, Inc."

Ringsby contends that the compensation agreement and covenant not to sue executed by plaintiff in favor of Converse operates as a release of Ringsby. The basic point of this argument is that "Ringsby's liability in this case is based solely upon the principal of respondeat superior, there being no charge of independent negligence of Ringsby itself."

■ Such is not the fact. The plaintiff alleged in his complaint that Ringsby operated the truck terminal and was negligent in certain particulars. Under such pleadings the plaintiff was allowed to prove direct operation of the terminal and negligence by Ringsby, or operation of the terminal by an agent, Converse, and negligence of the agent. *Scibor v. Oregon-Washington R. & N. Co.*, 70 Or 116, 140 P 629 (1914). The trial court found that Ringsby was directly operating the terminal and was liable to plaintiff apart from any respondeat superior liability through the negligence of Converse. We agree with these findings. It is true that there is some confusion as to whether some of the employees, including Sayres, the terminal manager, were employed by Ringsby or by Converse. Considering the confusion in the record as to the actual corporate relationship between Ringsby and Converse, this is

easily understandable. The record does not disclose the reason that Sayres signed the compensation agreement on behalf of Converse. However, as Converse had not been dissolved until it was purchased by Fortier Transportation in 1964, at the time of the execution of the compensation agreement it was still a corporate entity. If Sayres had no authority to bind Converse to the terms of the compensation agreement, such lack of authority was a matter between plaintiff and Converse.

■ The trial court correctly determined that the execution of the compensation agreement did not release Ringsby.

Ringsby also assigns as error the refusal of the court to grant its motion for a judgment n.o.v. The motion raised the same issues regarding the compensation agreement and was properly denied. Ringsby also contends that it was entitled to a pro tanto reduction of the judgment for the same reasons raised by Standard. This assignment of error is also without merit.

The judgment against Ringsby is also affirmed.